SUTTON ET AL. *v.* UNITED AIR LINES, INC.

No. 97–1943.   Argued April 28, 1999—Decided June 22, 1999

472

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. GINSBURG, J., filed a concurring opinion, *post*, p. 494. STEVENS, J., filed a dissenting opinion, in which BREYER, J., joined, *post*, p. 495. BREYER, J., filed a dissenting opinion, *post*, p. 513.

*Van Aaron Hughes* argued the cause for petitioners. With him on the briefs were *Tucker K. Trautman* and *Shawn D. Mitchell.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging reversal. On the briefs were *Solicitor General Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, James A. Feldman, Jessica Dunsay Silver, Seth M. Galanter, Philip B. Sklover,* and *Carolyn L. Wheeler.*

*Roy T. Englert, Jr.,* argued the cause for respondent. With him on the brief were *Lisa Hogan* and *Patrick F. Carrigan.**

---

*Briefs of *amici curiae* urging reversal were filed for AIDS Action et al. by *Claudia Center* and *Guy Wallace;* for the American Civil Liberties Union by *Louis M. Bograd, Chai R. Feldblum, Steven R. Shapiro,* and *Matthew A. Coles;* for the American Federation of Labor and Congress of Industrial Organizations by *Jonathan P. Hiatt, Marsha S. Berzon,* and *Laurence Gold;* and for the National Employment Lawyers Association by *Gary Phelan* and *Paula A. Brantner.*

Briefs of *amici curiae* urging affirmance were filed for the Air Transport Association of America, Inc., by *John J. Gallagher, Neal D. Mollen,* and *Margaret H. Spurlin;* and for the Equal Employment Advisory Council et al. by *Ann Elizabeth Reesman, Corrie L. Fischel, Stephen A. Bokat, Robin S. Conrad,* and *J. Walker Henry.*

Briefs of *amici curiae* were filed for LPA, Inc., by *Daniel V. Yager;* for the Society for Human Resource Management by *Peter J. Petesch, Thomas J. Walsh, Jr., Timothy S. Bland,* and *David S. Harvey, Jr.;* and for Senator Tom Harkin et al. by *Arlene B. Mayerson.*

JUSTICE O'CONNOR delivered the opinion of the Court.

The Americans with Disabilities Act of 1990 (ADA or Act), 104 Stat. 328, 42 U. S. C. § 12101 *et seq.*, prohibits certain employers from discriminating against individuals on the basis of their disabilities. See § 12112(a). Petitioners challenge the dismissal of their ADA action for failure to state a claim upon which relief can be granted. We conclude that the complaint was properly dismissed. In reaching that result, we hold that the determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment, including, in this instance, eyeglasses and contact lenses. In addition, we hold that petitioners failed to allege properly that respondent "regarded" them as having a disability within the meaning of the ADA.

I

Petitioners' amended complaint was dismissed for failure to state a claim upon which relief could be granted. See Fed. Rule Civ. Proc. 12(b)(6). Accordingly, we accept the allegations contained in their complaint as true for purposes of this case. See *United States* v. *Gaubert*, 499 U. S. 315, 327 (1991).

Petitioners are twin sisters, both of whom have severe myopia. Each petitioner's uncorrected visual acuity is 20/200 or worse in her right eye and 20/400 or worse in her left eye, but "[w]ith the use of corrective lenses, each . . . has vision that is 20/20 or better." App. 23. Consequently, without corrective lenses, each "effectively cannot see to conduct numerous activities such as driving a vehicle, watching television or shopping in public stores," *id.*, at 24, but with corrective measures, such as glasses or contact lenses, both "function identically to individuals without a similar impairment," *ibid.*

In 1992, petitioners applied to respondent for employment as commercial airline pilots. They met respondent's basic age, education, experience, and Federal Aviation Adminis-

tration certification qualifications. After submitting their applications for employment, both petitioners were invited by respondent to an interview and to flight simulator tests. Both were told during their interviews, however, that a mistake had been made in inviting them to interview because petitioners did not meet respondent's minimum vision requirement, which was uncorrected visual acuity of 20/100 or better. Due to their failure to meet this requirement, petitioners' interviews were terminated, and neither was offered a pilot position.

In light of respondent's proffered reason for rejecting them, petitioners filed a charge of disability discrimination under the ADA with the Equal Employment Opportunity Commission (EEOC). After receiving a right to sue letter, petitioners filed suit in the United States District Court for the District of Colorado, alleging that respondent had discriminated against them "on the basis of their disability, or because [respondent] regarded [petitioners] as having a disability" in violation of the ADA. App. 26. Specifically, petitioners alleged that due to their severe myopia they actually have a substantially limiting impairment or are regarded as having such an impairment, see id., at 23–26, and are thus disabled under the Act.

The District Court dismissed petitioners' complaint for failure to state a claim upon which relief could be granted. See Civ. A. No. 96–5–121 (Aug. 28, 1996), App. to Pet. for Cert. A–27. Because petitioners could fully correct their visual impairments, the court held that they were not actually substantially limited in any major life activity and thus had not stated a claim that they were disabled within the meaning of the ADA. Id., at A–32 to A–36. The court also determined that petitioners had not made allegations sufficient to support their claim that they were "regarded" by respondent as having an impairment that substantially limits a major life activity. Id., at A–36 to A–37. The court observed that "[t]he statutory reference to a substantial limi-

tation indicates . . . that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved." *Ibid.* But petitioners had alleged only that respondent regarded them as unable to satisfy the requirements of a particular job, global airline pilot. Consequently, the court held that petitioners had not stated a claim that they were regarded as substantially limited in the major life activity of working. Employing similar logic, the Court of Appeals for the Tenth Circuit affirmed the District Court's judgment. 130 F. 3d 893 (1997).

The Tenth Circuit's decision is in tension with the decisions of other Courts of Appeals. See, *e. g., Bartlett* v. *New York State Bd. of Law Examiners,* 156 F. 3d 321, 329 (CA2 1998) (holding self-accommodations cannot be considered when determining a disability), cert. pending, No. 98–1285; *Baert* v. *Euclid Beverage, Ltd.,* 149 F. 3d 626, 629–630 (CA7 1998) (holding disabilities should be determined without reference to mitigating measures); *Matczak* v. *Frankford Candy & Chocolate Co.,* 136 F. 3d 933, 937–938 (CA3 1997) (same); *Arnold* v. *United Parcel Service, Inc.,* 136 F. 3d 854, 859–866 (CA1 1998) (same); see also *Washington* v. *HCA Health Servs. of Texas, Inc.,* 152 F. 3d 464, 470–471 (CA5 1998) (holding that only some impairments should be evaluated in their uncorrected state), cert. pending, No. 98–1365. We granted certiorari, 525 U. S. 1063 (1999), and now affirm.

## II

The ADA prohibits discrimination by covered entities, including private employers, against qualified individuals with a disability. Specifically, it provides that no covered employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges

of employment." 42 U. S. C. § 12112(a); see also § 12111(2) ("The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee"). A "qualified individual with a disability" is identified as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." § 12111(8). In turn, a "disability" is defined as:

> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> "(B) a record of such an impairment; or
>
> "(C) being regarded as having such an impairment." § 12102(2).

Accordingly, to fall within this definition one must have an actual disability (subsection (A)), have a record of a disability (subsection (B)), or be regarded as having one (subsection (C)).

The parties agree that the authority to issue regulations to implement the Act is split primarily among three Government agencies. According to the parties, the EEOC has authority to issue regulations to carry out the employment provisions in Title I of the ADA, §§ 12111–12117, pursuant to § 12116 ("Not later than 1 year after [the date of enactment of this Act], the Commission shall issue regulations in an accessible format to carry out this subchapter in accordance with subchapter II of chapter 5 of title 5"). The Attorney General is granted authority to issue regulations with respect to Title II, subtitle A, §§ 12131–12134, which relates to public services. See § 12134 ("Not later than 1 year after [the date of enactment of this Act], the Attorney General shall promulgate regulations in an accessible format that implement this part"). Finally, the Secretary of Transportation has authority to issue regulations pertaining to the transportation provisions of Titles II and III. See § 12149(a)

("Not later than 1 year after [the date of enactment of this Act], the Secretary of Transportation shall issue regulations, in an accessible format, necessary for carrying out this subpart (other than section 12143 of this title)"); § 12164 (substantially same); § 12186(a)(1) (substantially same); § 12143(b) ("Not later than one year after [the date of enactment of this Act], the Secretary shall issue final regulations to carry out this section"). See also § 12204 (granting authority to the Architectural and Transportation Barriers Compliance Board to issue minimum guidelines to supplement the existing Minimum Guidelines and Requirements for Accessible Design). Moreover, each of these agencies is authorized to offer technical assistance regarding the provisions they administer. See § 12206(c)(1) ("Each Federal agency that has responsibility under paragraph (2) for implementing this chapter may render technical assistance to individuals and institutions that have rights or duties under the respective subchapter or subchapters of this chapter for which such agency has responsibility").

No agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see §§ 12101–12102, which fall outside Titles I–V. Most notably, no agency has been delegated authority to interpret the term "disability." § 12102(2). JUSTICE BREYER's contrary, imaginative interpretation of the Act's delegation provisions, see *post*, at 514–515 (dissenting opinion), is belied by the terms and structure of the ADA. The EEOC has, nonetheless, issued regulations to provide additional guidance regarding the proper interpretation of this term. After restating the definition of disability given in the statute, see 29 CFR § 1630.2(g) (1998), the EEOC regulations define the three elements of disability: (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." See §§ 1630.2(h)–(j). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement,

or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." § 1630.2(h)(1). The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." § 1630.2(j). Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." § 1630.2(i). Because both parties accept these regulations as valid, and determining their validity is not necessary to decide this case, we have no occasion to consider what deference they are due, if any.

The agencies have also issued interpretive guidelines to aid in the implementation of their regulations. For instance, at the time that it promulgated the above regulations, the EEOC issued an "Interpretive Guidance," which provides that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 CFR pt. 1630, App. § 1630.2(j) (1998) (describing § 1630.2(j)). The Department of Justice has issued a similar guideline. See 28 CFR pt. 35, App. A, § 35.104 ("The question of whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable modification or auxiliary aids and services"); pt. 36, App. B, § 36.104 (same). Although the parties dispute the persuasive force of these interpretive guidelines, we have no need in this case to decide what deference is due.

### III

With this statutory and regulatory framework in mind, we turn first to the question whether petitioners have stated a claim under subsection (A) of the disability definition, that is, whether they have alleged that they possess a physical impairment that substantially limits them in one or more major life activities. See 42 U. S. C. § 12102(2)(A). Because petitioners allege that with corrective measures their vision "is 20/20 or better," App. 23, they are not actually disabled within the meaning of the Act if the "disability" determination is made with reference to these measures. Consequently, with respect to subsection (A) of the disability definition, our decision turns on whether disability is to be determined with or without reference to corrective measures.

Petitioners maintain that whether an impairment is substantially limiting should be determined without regard to corrective measures. They argue that, because the ADA does not directly address the question at hand, the Court should defer to the agency interpretations of the statute, which are embodied in the agency guidelines issued by the EEOC and the Department of Justice. These guidelines specifically direct that the determination of whether an individual is substantially limited in a major life activity be made without regard to mitigating measures. See 29 CFR pt. 1630, App. § 1630.2(j); 28 CFR pt. 35, App. A § 35.104 (1998); 28 CFR pt. 36, App. B § 36.104.

Respondent, in turn, maintains that an impairment does not substantially limit a major life activity if it is corrected. It argues that the Court should not defer to the agency guidelines cited by petitioners because the guidelines conflict with the plain meaning of the ADA. The phrase "substantially limits one or more major life activities," it explains, requires that the substantial limitations actually and presently exist. Moreover, respondent argues, disregarding mitigating measures taken by an individual defies the statu-

tory command to examine the effect of the impairment on the major life activities "of such individual." And even if the statute is ambiguous, respondent claims, the guidelines' directive to ignore mitigating measures is not reasonable, and thus this Court should not defer to it.

We conclude that respondent is correct that the approach adopted by the agency guidelines—that persons are to be evaluated in their hypothetical uncorrected state—is an impermissible interpretation of the ADA. Looking at the Act as a whole, it is apparent that if a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures—both positive and negative— must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act. JUSTICE STEVENS relies on the legislative history of the ADA for the contrary proposition that individuals should be examined in their uncorrected state. See *post*, at 499–501 (dissenting opinion). Because we decide that, by its terms, the ADA cannot be read in this manner, we have no reason to consider the ADA's legislative history.

Three separate provisions of the ADA, read in concert, lead us to this conclusion. The Act defines a "disability" as "a physical or mental impairment that *substantially limits* one or more of the major life activities" of an individual. § 12102(2)(A) (emphasis added). Because the phrase "substantially limits" appears in the Act in the present indicative verb form, we think the language is properly read as requiring that a person be presently—not potentially or hypothetically—substantially limited in order to demonstrate a disability. A "disability" exists only where an impairment "substantially limits" a major life activity, not where it "might," "could," or "would" be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "sub-

stantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

The definition of disability also requires that disabilities be evaluated "with respect to an individual" and be determined based on whether an impairment substantially limits the "major life activities of such individual." § 12102(2). Thus, whether a person has a disability under the ADA is an individualized inquiry. See *Bragdon* v. *Abbott*, 524 U.S. 624, 641–642 (1998) (declining to consider whether HIV infection is a *per se* disability under the ADA); 29 CFR pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual").

The agency guidelines' directive that persons be judged in their uncorrected or unmitigated state runs directly counter to the individualized inquiry mandated by the ADA. The agency approach would often require courts and employers to speculate about a person's condition and would, in many cases, force them to make a disability determination based on general information about how an uncorrected impairment usually affects individuals, rather than on the individual's actual condition. For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, the guidelines approach would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than

as individuals. This is contrary to both the letter and the spirit of the ADA.

The guidelines approach could also lead to the anomalous result that in determining whether an individual is disabled, courts and employers could not consider any negative side effects suffered by an individual resulting from the use of mitigating measures, even when those side effects are very severe. See, *e. g.*, Johnson, Antipsychotics: Pros and Cons of Antipsychotics, RN (Aug. 1997) (noting that antipsychotic drugs can cause a variety of adverse effects, including neuroleptic malignant syndrome and painful seizures); Liver Risk Warning Added to Parkinson's Drug, FDA Consumer (Mar. 1, 1999) (warning that a drug for treating Parkinson's disease can cause liver damage); Curry & Kulling, Newer Antiepileptic Drugs, American Family Physician (Feb. 1, 1998) (cataloging serious negative side effects of new antiepileptic drugs). This result is also inconsistent with the individualized approach of the ADA.

Finally, and critically, findings enacted as part of the ADA require the conclusion that Congress did not intend to bring under the statute's protection all those whose uncorrected conditions amount to disabilities. Congress found that "some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older." § 12101(a)(1). This figure is inconsistent with the definition of disability pressed by petitioners.

Although the exact source of the 43 million figure is not clear, the corresponding finding in the 1988 precursor to the ADA was drawn directly from a report prepared by the National Council on Disability. See Burgdorf, The Americans with Disabilities Act: Analysis and Implications of a Second-Generation Civil Rights Statute, 26 Harv. Civ. Rights-Civ. Lib. L. Rev. 413, 434, n. 117 (1991) (reporting, in an article authored by the drafter of the original ADA bill introduced in Congress in 1988, that the report was the source for a

figure of 36 million disabled persons quoted in the versions of the bill introduced in 1988). That report detailed the difficulty of estimating the number of disabled persons due to varying operational definitions of disability. National Council on Disability, Toward Independence 10 (1986). It explained that the estimates of the number of disabled Americans ranged from an overinclusive 160 million under a "health conditions approach," which looks at all conditions that impair the health or normal functional abilities of an individual, to an underinclusive 22.7 million under a "work disability approach," which focuses on individuals' reported ability to work. *Id.*, at 10–11. It noted that "a figure of 35 or 36 million [was] the most commonly quoted estimate." *Id.*, at 10. The 36 million number included in the 1988 bill's findings thus clearly reflects an approach to defining disabilities that is closer to the work disabilities approach than the health conditions approach.

This background also provides some clues to the likely source of the figure in the findings of the 1990 Act. Roughly two years after issuing its 1986 report, the National Council on Disability issued an updated report. See On the Threshold of Independence (1988). This 1988 report settled on a more concrete definition of disability. It stated that 37.3 million individuals have "difficulty performing one or more basic physical activities," including "seeing, hearing, speaking, walking, using stairs, lifting or carrying, getting around outside, getting around inside, and getting into or out of bed." *Id.*, at 19. The study from which it drew this data took an explicitly functional approach to evaluating disabilities. See U. S. Dept. of Commerce, Bureau of Census, Disability, Functional Limitation, and Health Insurance Coverage: 1984/85, p. 2 (1986). It measured 37.3 million persons with a "functional limitation" on performing certain basic activities when using, as the questionnaire put it, "special aids," such as glasses or hearing aids, if the person usually used such aids. *Id.*, at 1, 47. The number of dis-

abled provided by the study and adopted in the 1988 report, however, includes only noninstitutionalized persons with physical disabilities who are over age 15. The 5.7 million gap between the 43 million figure in the ADA's findings and the 37.3 million figure in the report can thus probably be explained as an effort to include in the findings those who were excluded from the National Council figure. See, *e. g.*, National Institute on Disability and Rehabilitation Research, Data on Disability from the National Health Interview Survey 1983–1985, pp. 61–62 (1988) (finding approximately 943,000 noninstitutionalized persons with an activity limitation due to mental illness; 947,000 noninstitutionalized persons with an activity limitation due to mental retardation; 1,900,000 noninstitutionalized persons under 18 with an activity limitation); U. S. Dept. of Commerce, Bureau of the Census, Statistical Abstract of the United States 106 (1989) (Table 168) (finding 1,553,000 resident patients in nursing and related care facilities (excluding hospital-based nursing homes) in 1986).

Regardless of its exact source, however, the 43 million figure reflects an understanding that those whose impairments are largely corrected by medication or other devices are not "disabled" within the meaning of the ADA. The estimate is consistent with the numbers produced by studies performed during this same time period that took a similar functional approach to determining disability. For instance, Mathematica Policy Research, Inc., drawing on data from the National Center for Health Statistics, issued an estimate of approximately 31.4 million civilian noninstitutionalized persons with "chronic activity limitation status" in 1979. Digest of Data on Persons with Disabilities 25 (1984). The 1989 Statistical Abstract offered the same estimate based on the same data, as well as an estimate of 32.7 million noninstitutionalized persons with "activity limitation" in 1985. Statistical Abstract, *supra*, at 115 (Table 184). In both cases, individuals with "activity limitations" were those who,

relative to their age-sex group could not conduct "usual" activities: *e. g.*, attending preschool, keeping house, or living independently. See National Center for Health Statistics, U. S. Dept. of Health and Human Services, Vital and Health Statistics, Current Estimates from the National Health Interview Survey, 1989, Series 10, pp. 7–8 (1990).

By contrast, nonfunctional approaches to defining disability produce significantly larger numbers. As noted above, the 1986 National Council on Disability report estimated that there were over 160 million disabled under the "health conditions approach." Toward Independence, *supra*, at 10; see also Mathematica Policy Research, *supra*, at 3 (arriving at similar estimate based on same Census Bureau data). Indeed, the number of people with vision impairments alone is 100 million. See National Advisory Eye Council, U. S. Dept. of Health and Human Services, Vision Research—A National Plan: 1999–2003, p. 7 (1998) ("[M]ore than 100 million people need corrective lenses to see properly"). "It is estimated that more than 28 million Americans have impaired hearing." National Institutes of Health, National Strategic Research Plan: Hearing and Hearing Impairment v (1996). And there were approximately 50 million people with high blood pressure (hypertension). Tindall, Stalking a Silent Killer; Hypertension, Business & Health 37 (August 1998) ("Some 50 million Americans have high blood pressure").

Because it is included in the ADA's text, the finding that 43 million individuals are disabled gives content to the ADA's terms, specifically the term "disability." Had Congress intended to include all persons with corrected physical limitations among those covered by the Act, it undoubtedly would have cited a much higher number of disabled persons in the findings. That it did not is evidence that the ADA's coverage is restricted to only those whose impairments are not mitigated by corrective measures.

The dissents suggest that viewing individuals in their corrected state will exclude from the definition of "disab[led]"

those who use prosthetic limbs, see *post,* at 497–498 (opinion of STEVENS, J.), *post,* at 513 (opinion of BREYER, J.), or take medicine for epilepsy or high blood pressure, see *post,* at 507, 509 (opinion of STEVENS, J.).  This suggestion is incorrect. The use of a corrective device does not, by itself, relieve one's disability.  Rather, one has a disability under subsection (A) if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity.  For example, individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run.  The same may be true of individuals who take medicine to lessen the symptoms of an impairment so that they can function but nevertheless remain substantially limited.  Alternatively, one whose high blood pressure is "cured" by medication may be regarded as disabled by a covered entity, and thus disabled under subsection (C) of the definition.  The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting.

Applying this reading of the Act to the case at hand, we conclude that the Court of Appeals correctly resolved the issue of disability in respondent's favor.  As noted above, petitioners allege that with corrective measures, their visual acuity is 20/20, App. 23, Amended Complaint ¶ 36, and that they "function identically to individuals without a similar impairment," *id.,* at 24, Amended Complaint ¶ 37e.  In addition, petitioners concede that they "do not argue that the use of corrective lenses in itself demonstrates a substantially limiting impairment."  Brief for Petitioners 9, n. 11.  Accordingly, because we decide that disability under the Act is to be determined with reference to corrective measures, we agree with the courts below that petitioners have not stated

a claim that they are substantially limited in any major life activity.

## IV

Our conclusion that petitioners have failed to state a claim that they are actually disabled under subsection (A) of the disability definition does not end our inquiry. Under subsection (C), individuals who are "regarded as" having a disability are disabled within the meaning of the ADA. See § 12102(2)(C). Subsection (C) provides that having a disability includes "being regarded as having," § 12102(2)(C), "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," § 12102(2)(A). There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual—it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of . . . individual ability." See 42 U. S. C. § 12101(7). See also *School Bd. of Nassau Cty.* v. *Arline*, 480 U. S. 273, 284 (1987) ("By amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired and who, as a result, are substantially limited in a major life activity, Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment"); 29 CFR pt. 1630, App. § 1630.2(l) (explaining that the purpose of the regarded as prong is to cover individuals "re-

jected from a job because of the 'myths, fears and stereo-types' associated with disabilities").

There is no dispute that petitioners are physically impaired. Petitioners do not make the obvious argument that they are regarded due to their impairments as substantially limited in the major life activity of seeing. They contend only that respondent mistakenly believes their physical impairments substantially limit them in the major life activity of working. To support this claim, petitioners allege that respondent has a vision requirement that is allegedly based on myth and stereotype. Further, this requirement substantially limits their ability to engage in the major life activity of working by precluding them from obtaining the job of global airline pilot, which they argue is a "class of employment." See App. 24–26, Amended Complaint ¶ 38. In reply, respondent argues that the position of global airline pilot is not a class of jobs and therefore petitioners have not stated a claim that they are regarded as substantially limited in the major life activity of working.

Standing alone, the allegation that respondent has a vision requirement in place does not establish a claim that respondent regards petitioners as substantially limited in the major life activity of working. See Post-Argument Brief for Respondent 2–3 (advancing this argument); Post-Argument Brief for United States et al. as *Amici Curiae* 5–6 ("[U]nder the EEOC's regulations, an employer may make employment decisions based on physical characteristics"). By its terms, the ADA allows employers to prefer some physical attributes over others and to establish physical criteria. An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity. Accordingly, an employer is free to decide that physical characteristics or medical conditions that do not rise to the level of an impairment—such as one's height, build, or singing voice—are preferable to others, just as it is free to

decide that some limiting, but not *substantially* limiting, impairments make individuals less than ideally suited for a job.

Considering the allegations of the amended complaint in tandem, petitioners have not stated a claim that respondent regards their impairment as *substantially limiting* their ability to work. The ADA does not define "substantially limits," but "substantially" suggests "considerable" or "specified to a large degree." See Webster's Third New International Dictionary 2280 (1976) (defining "substantially" as "in a substantial manner" and "substantial" as "considerable in amount, value, or worth" and "being that specified to a large degree or in the main"); see also 17 Oxford English Dictionary 66–67 (2d ed. 1989) ("substantial": "[r]elating to or proceeding from the essence of a thing; essential"; "of ample or considerable amount, quantity or dimensions"). The EEOC has codified regulations interpreting the term "substantially limits" in this manner, defining the term to mean "[u]nable to perform" or "[s]ignificantly restricted." See 29 CFR §§ 1630.2(j)(1)(i), (ii) (1998).

When the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs. Reflecting this requirement, the EEOC uses a specialized definition of the term "substantially limits" when referring to the major life activity of working:

> "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." § 1630.2(j)(3)(i).

The EEOC further identifies several factors that courts should consider when determining whether an individual is

substantially limited in the major life activity of working, including the geographical area to which the individual has reasonable access, and "the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified." §§ 1630.2(j)(3)(ii)(A), (B). To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job of choice. If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.

Because the parties accept that the term "major life activities" includes working, we do not determine the validity of the cited regulations. We note, however, that there may be some conceptual difficulty in defining "major life activities" to include work, for it seems "to argue in a circle to say that if one is excluded, for instance, by reason of [an impairment, from working with others] . . . then that exclusion constitutes an impairment, when the question you're asking is, whether the exclusion itself is by reason of handicap." Tr. of Oral Arg. in *School Bd. of Nassau Co.* v. *Arline,* O. T. 1986, No. 85–1277, p. 15 (argument of Solicitor General). Indeed, even the EEOC has expressed reluctance to define "major life activities" to include working and has suggested that working be viewed as a residual life activity, considered, as a last resort, *only* "[i]f an individual is not substantially limited with respect to *any other* major life activity." 29 CFR pt. 1630, App. § 1630.2(j) (1998) (emphasis added) ("If an individual is substantially limited in *any other* major life activity, no determination should be made as to whether the individual is substantially limited in working" (emphasis added)).

Assuming without deciding that working is a major life activity and that the EEOC regulations interpreting the term "substantially limits" are reasonable, petitioners have

failed to allege adequately that their poor eyesight is regarded as an impairment that substantially limits them in the major life activity of working. They allege only that respondent regards their poor vision as precluding them from holding positions as a "global airline pilot." See App. 25–26, Amended Complaint ¶ 38f. Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a *substantially limiting* impairment. See 29 CFR § 1630.2(j)(3)(i) (1998) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working"). Indeed, there are a number of other positions utilizing petitioners' skills, such as regional pilot and pilot instructor to name a few, that are available to them. Even under the EEOC's Interpretative Guidance, to which petitioners ask us to defer, "an individual who cannot be a commercial airline pilot because of a minor vision impairment, but who can be a commercial airline co-pilot or a pilot for a courier service, would not be substantially limited in the major life activity of working." 29 CFR pt. 1630, App. § 1630.2 (1998).

Petitioners also argue that if one were to assume that a substantial number of airline carriers have similar vision requirements, they would be substantially limited in the major life activity of working. See Brief for Petitioners 44–45. Even assuming for the sake of argument that the adoption of similar vision requirements by other carriers would represent a substantial limitation on the major life activity of working, the argument is nevertheless flawed. It is not enough to say that if the physical criteria of a single employer were *imputed* to all similar employers one would be regarded as substantially limited in the major life activity of working *only as a result of this imputation.* An otherwise valid job requirement, such as a height requirement, does not become invalid simply because it *would* limit a person's employment opportunities in a substantial way *if* it were

adopted by a substantial number of employers. Because petitioners have not alleged, and cannot demonstrate, that respondent's vision requirement reflects a belief that petitioners' vision substantially limits them, we agree with the decision of the Court of Appeals affirming the dismissal of petitioners' claim that they are regarded as disabled.

For these reasons, the judgment of the Court of Appeals for the Tenth Circuit is affirmed.

*It is so ordered.*

JUSTICE GINSBURG, concurring.

I agree that 42 U. S. C. § 12102(2)(A) does not reach the legions of people with correctable disabilities. The strongest clues to Congress' perception of the domain of the Americans with Disabilities Act of 1990 (ADA), as I see it, are legislative findings that "some 43,000,000 Americans have one or more physical or mental disabilities," § 12101(a)(1), and that "individuals with disabilities are a discrete and insular minority," persons "subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society," § 12101(a)(7). These declarations are inconsistent with the enormously embracing definition of disability petitioners urge. As the Court demonstrates, see *ante*, at 483–487, the inclusion of correctable disabilities within the ADA's domain would extend the Act's coverage to far more than 43 million people. And persons whose uncorrected eyesight is poor, or who rely on daily medication for their well-being, can be found in every social and economic class; they do not cluster among the politically powerless, nor do they coalesce as historical victims of discrimination. In short, in no sensible way can one rank the large numbers of diverse individuals with corrected disabilities as a "discrete and insular minority." I do not mean to suggest that any of the constitutional presumptions or doctrines that may apply to "discrete and insular" minorities in other contexts are relevant here; there is no con-

stitutional dimension to this case. Congress' use of the phrase, however, is a telling indication of its intent to restrict the ADA's coverage to a confined, and historically disadvantaged, class.

JUSTICE STEVENS, with whom JUSTICE BREYER joins, dissenting.

When it enacted the Americans with Disabilities Act of 1990 (ADA or Act), Congress certainly did not intend to require United Air Lines to hire unsafe or unqualified pilots. Nor, in all likelihood, did it view every person who wears glasses as a member of a "discrete and insular minority." Indeed, by reason of legislative myopia it may not have foreseen that its definition of "disability" might theoretically encompass, not just "some 43,000,000 Americans," 42 U. S. C. § 12101(a)(1), but perhaps two or three times that number. Nevertheless, if we apply customary tools of statutory construction, it is quite clear that the threshold question whether an individual is "disabled" within the meaning of the Act—and, therefore, is entitled to the basic assurances that the Act affords—focuses on her past or present physical condition without regard to mitigation that has resulted from rehabilitation, self-improvement, prosthetic devices, or medication. One might reasonably argue that the general rule should not apply to an impairment that merely requires a nearsighted person to wear glasses. But I believe that, in order to be faithful to the remedial purpose of the Act, we should give it a generous, rather than a miserly, construction.

There are really two parts to the question of statutory construction presented by this case. The first question is whether the determination of disability for people that Congress unquestionably intended to cover should focus on their unmitigated or their mitigated condition. If the correct answer to that question is the one provided by eight of the

nine Federal Courts of Appeals to address the issue,[1] and by all three of the Executive agencies that have issued regulations or interpretive bulletins construing the statute—namely, that the statute defines "disability" without regard to ameliorative measures—it would still be necessary to decide whether that general rule should be applied to what might be characterized as a "minor, trivial impairment." *Arnold* v. *United Parcel Service, Inc.*, 136 F. 3d 854, 866, n. 10 (CA1 1998) (holding that unmitigated state is determinative but suggesting that it "might reach a different result" in a case in which "a simple, inexpensive remedy," such as eyeglasses, is available "that can provide total and relatively permanent control of all symptoms"). See also *Washington* v. *HCA Health Servs. of Texas*, 152 F. 3d 464 (CA5 1998) (same), cert. pending, No. 98–1365. I shall therefore first consider impairments that Congress surely had in mind before turning to the special facts of this case.

## I

"As in all cases of statutory construction, our task is to interpret the words of [the statute] in light of the purposes Congress sought to serve." *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 608 (1979). Congress

---

[1] See *Bartlett* v. *New York State Bd. of Law Examiners*, 156 F. 3d 321, 329 (CA2 1998), cert. pending, No. 98–1285; *Washington* v. *HCA Health Servs. of Texas*, 152 F. 3d 464, 470–471 (CA5 1998), cert. pending, No. 98–1365; *Baert* v. *Euclid Beverage, Ltd.*, 149 F. 3d 626, 629–630 (CA7 1998); *Arnold* v. *United Parcel Service, Inc.*, 136 F. 3d 854, 859–866 (CA1 1998); *Matcza* v. *Frankford Candy & Chocolate Co.*, 136 F. 3d 933, 937–938 (CA3 1997); *Doane* v. *Omaha*, 115 F. 3d 624, 627 (CA8 1997); *Harris* v. *H & W Contracting Co.*, 102 F. 3d 516, 520–521 (CA11 1996); *Holihan* v. *Lucky Stores, Inc.*, 87 F. 3d 362, 366 (CA9 1996). While a Sixth Circuit decision could be read as expressing doubt about the majority rule, see *Gilday* v. *Mecosta County*, 124 F. 3d 760, 766–768 (1997) (Kennedy, J., concurring in part and dissenting in part); *id.*, at 768 (Guy, J., concurring in part and dissenting in part), the sole holding contrary to this line of authority is the Tenth Circuit's opinion that the Court affirms today.

expressly provided that the "purpose of [the ADA is] to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U. S. C. § 12101(b)(1). To that end, the ADA prohibits covered employers from "discriminat[ing] against a qualified individual *with a disability* because of the disability" in regard to the terms, conditions, and privileges of employment. 42 U. S. C. § 12112(a) (emphasis added).

The Act's definition of disability is drawn "almost verbatim" from the Rehabilitation Act of 1973, 29 U. S. C. § 706(8)(B). *Bragdon* v. *Abbott*, 524 U. S. 624, 631 (1998). The ADA's definition provides:

> "The term 'disability' means, with respect to an individual—
>
> "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> "(B) a record of such an impairment; or
>
> "(C) being regarded as having such an impairment." 42 U. S. C. § 12102(2).

The three parts of this definition do not identify mutually exclusive, discrete categories. On the contrary, they furnish three overlapping formulas aimed at ensuring that individuals who now have, or ever had, a substantially limiting impairment are covered by the Act.

An example of a rather common condition illustrates this point: There are many individuals who have lost one or more limbs in industrial accidents, or perhaps in the service of their country in places like Iwo Jima. With the aid of prostheses, coupled with courageous determination and physical therapy, many of these hardy individuals can perform all of their major life activities just as efficiently as an average couch potato. If the Act were just concerned with their present ability to participate in society, many of these individuals' physical impairments would not be viewed as dis-

abilities. Similarly, if the statute were solely concerned with whether these individuals viewed themselves as disabled—or with whether a majority of employers regarded them as unable to perform most jobs—many of these individuals would lack statutory protection from discrimination based on their prostheses.

The sweep of the statute's three-pronged definition, however, makes it pellucidly clear that Congress intended the Act to cover such persons. The fact that a prosthetic device, such as an artificial leg, has restored one's ability to perform major life activities surely cannot mean that subsection (A) of the definition is inapplicable. Nor should the fact that the individual considers himself (or actually is) "cured," or that a prospective employer considers him generally employable, mean that subsections (B) or (C) are inapplicable. But under the Court's emphasis on "the present indicative verb form" used in subsection (A), *ante*, at 482, that subsection presumably would not apply. And under the Court's focus on the individual's "presen[t]—not potentia[l] or hypothetica[l]"—condition, *ibid.*, and on whether a person is "precluded from a broad range of jobs," *ante*, at 492, subsections (B) and (C) presumably would not apply.

In my view, when an employer refuses to hire the individual "because of" his prosthesis, and the prosthesis in no way affects his ability to do the job, that employer has unquestionably discriminated against the individual in violation of the Act. Subsection (B) of the definition, in fact, sheds a revelatory light on the question whether Congress was concerned only about the corrected or mitigated status of a person's impairment. If the Court is correct that "[a] 'disability' exists only where" a person's "present" or "actual" condition is substantially impaired, *ante*, at 482, there would be no reason to include in the protected class those who were once disabled but who are now fully recovered. Subsection (B) of the Act's definition, however, plainly covers a person who previously had a serious hearing impair-

ment that has since been completely cured. See *School Bd. of Nassau Cty.* v. *Arline,* 480 U. S. 273, 281 (1987). Still, if I correctly understand the Court's opinion, it holds that one who *continues to wear* a hearing aid that she has worn all her life might not be covered—fully cured impairments are covered, but merely treatable ones are not. The text of the Act surely does not require such a bizarre result.

The three prongs of the statute, rather, are most plausibly read together not to inquire into whether a person is currently "functionally" limited in a major life activity, but only into the existence of an impairment—present or past—that substantially limits, or did so limit, the individual before amelioration. This reading avoids the counterintuitive conclusion that the ADA's safeguards vanish when individuals make themselves more employable by ascertaining ways to overcome their physical or mental limitations.

To the extent that there may be doubt concerning the meaning of the statutory text, ambiguity is easily removed by looking at the legislative history. As then-JUSTICE REHNQUIST stated for the Court in *Garcia* v. *United States,* 469 U. S. 70 (1984): "In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying the proposed legislation.'" *Id.,* at 76 (quoting *Zuber* v. *Allen,* 396 U. S. 168, 186 (1969)). The Committee Reports on the bill that became the ADA make it abundantly clear that Congress intended the ADA to cover individuals who could perform all of their major life activities only with the help of ameliorative measures.

The ADA originated in the Senate. The Senate Report states that "whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids."

S. Rep. No. 101–116, p. 23 (1989). The Report further explained, in discussing the "regarded as" prong:

> "[An] important goal of the third prong of the [disability] definition is to ensure that persons with medical conditions that are under control, and that therefore do not currently limit major life activities, are not discriminated against on the basis of their medical conditions. For example, individuals with controlled diabetes or epilepsy are often denied jobs for which they are qualified. Such denials are the result of negative attitudes and misinformation." *Id.*, at 24.

When the legislation was considered in the House of Representatives, its Committees reiterated the Senate's basic understanding of the Act's coverage, with one minor modification: They clarified that "correctable" or "controllable" disabilities were covered in the first definitional prong as well. The Report of the House Committee on the Judiciary states, in discussing the first prong, that, when determining whether an individual's impairment substantially limits a major life activity, "[t]he impairment should be assessed without considering whether mitigating measures, such as auxiliary aids or reasonable accommodations, would result in a less-than-substantial limitation." H. R. Rep. No. 101–485, pt. III, p. 28 (1990). The Report continues that "a person with epilepsy, an impairment which substantially limits a major life activity, is covered under this test," *ibid.*, as is a person with poor hearing, "even if the hearing loss is corrected by the use of a hearing aid," *id.*, at 29.

The Report of the House Committee on Education and Labor likewise states that "[w]hether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable accommodations or auxiliary aids." *Id.*, pt. II, at 52. To make matters perfectly plain, the Report adds:

> "For example, a person who is hard of hearing is substantially limited in the major life activity of hearing,

*even though the loss may be corrected through the
use of a hearing aid.* Likewise, persons with impair-
ments, such as epilepsy or diabetes, which substantially
limit a major life activity are covered under the first
prong of the definition of disability, *even if the effects of
the impairment are controlled by medication."* *Ibid.*
(emphasis added).

All of the Reports, indeed, are replete with references to
the understanding that the Act's protected class includes
individuals with various medical conditions that ordinarily
are perfectly "correctable" with medication or treatment.
See *id.,* at 74 (citing with approval *Straithe* v. *Department
of Transportation,* 716 F. 2d 227 (CA3 1983), which held that
an individual with poor hearing was "handicapped" under
the Rehabilitation Act even though his hearing could be cor-
rected with a hearing aid); H. R. Rep. No. 101–485, pt. III,
at 51 ("[t]he term" disability includes "epilepsy, . . . heart
disease, diabetes"); *id.,* pt. III, at 28 (listing same impair-
ments); S. Rep. No. 101–116, at 22 (same).[2]

In addition, each of the three Executive agencies charged
with implementing the Act has consistently interpreted the
Act as mandating that the presence of disability turns on an
individual's uncorrected state. We have traditionally ac-
corded respect to such views when, as here, the agencies
"played a pivotal role in setting [the statutory] machinery in
motion." *Ford Motor Credit Co.* v. *Milhollin,* 444 U. S. 555,
566 (1980) (brackets in original; internal quotation marks and

---

[2]The House's decision to cover correctable impairments under sub-
section (A) of the statute seems, in retrospect, both deliberate and wise.
Much of the structure of the House Reports is borrowed from the Senate
Report; thus it appears that the House Committees consciously decided
to move the discussion of mitigating measures. This adjustment was
prudent because in a case in which an employer refuses, out of animus
or fear, to hire an individual who has a condition such as epilepsy that the
employer knows is controlled, it may be difficult to determine whether the
employer is viewing the individual in her uncorrected state or "regards"
her as substantially limited.

citation omitted). At the very least, these interpretations "constitute a body of experience and informed judgment to which [we] may properly resort" for additional guidance. *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 139–140 (1944). See also *Bragdon*, 524 U. S., at 642 (invoking this maxim with regard to the Equal Employment Opportunity Commission's (EEOC) interpretation of the ADA).

The EEOC's Interpretive Guidance provides that "[t]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis, without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 CFR pt. 1630, App. § 1630.2(j) (1998). The EEOC further explains:

> "[A]n individual who uses artificial legs would . . . be substantially limited in the major life activity of walking because the individual is unable to walk without the aid of prosthetic devices. Similarly, a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication." *Ibid.*

The Department of Justice has reached the same conclusion. Its regulations provide that "[t]he question of whether a person has a disability should be assessed without regard to the availability of mitigating measures, such as reasonable modification or auxiliary aids and services." 28 CFR pt. 35, App. A, § 35.104 (1998). The Department of Transportation has issued a regulation adopting this same definition of "disability." See 49 CFR pt. 37.3 (1998).

In my judgment, the Committee Reports and the uniform agency regulations merely confirm the message conveyed by the text of the Act—at least insofar as it applies to impairments such as the loss of a limb, the inability to hear, or any condition such as diabetes that is substantially limiting without medication. The Act generally protects individuals who have "correctable" substantially limiting impairments

from unjustified employment discrimination on the basis of those impairments. The question, then, is whether the fact that Congress was specifically concerned about protecting a class that included persons characterized as a "discrete and insular minority" and that it estimated that class to include "some 43,000,000 Americans" means that we should construe the term "disability" to exclude individuals with impairments that Congress probably did not have in mind.

## II

The EEOC maintains that, in order to remain allegiant to the Act's structure and purpose, courts should always answer "the question whether an individual has a disability . . . without regard to mitigating measures that the individual takes to ameliorate the effects of the impairment." Brief for United States et al. as *Amici Curiae* 6. "[T]here is nothing about poor vision," as the EEOC interprets the Act, "that would justify adopting a different rule in this case." *Ibid.*

If a narrow reading of the term "disability" were necessary in order to avoid the danger that the Act might otherwise force United to hire pilots who might endanger the lives of their passengers, it would make good sense to use the "43,000,000 Americans" finding to confine its coverage. There is, however, no such danger in this case. If a person is "disabled" within the meaning of the Act, she still cannot prevail on a claim of discrimination unless she can prove that the employer took action "because of" that impairment, 42 U. S. C. § 12112(a), and that she can, "with or without reasonable accommodation, . . . perform the essential functions" of the job of a commercial airline pilot. See § 12111(8). Even then, an employer may avoid liability if it shows that the criteria of having uncorrected visual acuity of at least 20/100 is "job-related and consistent with business necessity" or if such vision (even if correctable to 20/20) would pose a health or safety hazard. §§ 12113(a) and (b).

This case, in other words, is not about whether petitioners are genuinely qualified or whether they can perform the job of an airline pilot without posing an undue safety risk. The case just raises the threshold question whether petitioners are members of the ADA's protected class. It simply asks whether the ADA lets petitioners in the door in the same way as the Age Discrimination in Employment Act of 1967 does for every person who is at least 40 years old, see 29 U. S. C. § 631(a), and as Title VII of the Civil Rights Act of 1964 does for every single individual in the work force. Inside that door lies nothing more than basic protection from irrational and unjustified discrimination because of a characteristic that is beyond a person's control. Hence, this particular case, at its core, is about whether, assuming that petitioners can prove that they are "qualified," the airline has any duty to come forward with some legitimate explanation for refusing to hire them because of their uncorrected eyesight, or whether the ADA leaves the airline free to decline to hire petitioners on this basis even if it is acting purely on the basis of irrational fear and stereotype.

I think it quite wrong for the Court to confine the coverage of the Act simply because an interpretation of "disability" that adheres to Congress' method of defining the class it intended to benefit may also provide protection for "significantly larger numbers" of individuals, *ante*, at 487, than estimated in the Act's findings. It has long been a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin* v. *Knight*, 389 U. S. 332, 336 (1967). Congress sought, in enacting the ADA, to "provide a . . . comprehensive national mandate for the discrimination against individuals with disabilities." 42 U. S. C. § 12101(b)(1). The ADA, following the lead of the Rehabilitation Act before it, seeks to implement this mandate by encouraging employers "to replace . . . reflexive reactions to actual or perceived handicaps with actions based on medically sound judg-

ments." *Arline*, 480 U. S., at 284–285. Even if an authorized agency could interpret this statutory structure so as to pick and choose certain correctable impairments that Congress meant to exclude from this mandate, Congress surely has not authorized us to do so.

When faced with classes of individuals or types of discrimination that fall outside the core prohibitions of antidiscrimination statutes, we have consistently construed those statutes to include comparable evils within their coverage, even when the particular evil at issue was beyond Congress' immediate concern in passing the legislation. Congress, for instance, focused almost entirely on the problem of discrimination against African-Americans when it enacted Title VII of the Civil Rights Act of 1964. See, *e. g.*, *Steelworkers* v. *Weber*, 443 U. S. 193, 202–203 (1979). But that narrow focus could not possibly justify a construction of the statute that excluded Hispanic-Americans or Asian-Americans from its protection—or as we later decided (ironically enough, by relying on legislative history and according "great deference" to the EEOC's "interpretation"), Caucasians. See *McDonald* v. *Santa Fe Trail Transp. Co.*, 427 U. S. 273, 279–280 (1976).

We unanimously applied this well-accepted method of interpretation last Term with respect to construing Title VII to cover claims of same-sex sexual harassment. *Oncale* v. *Sundowner Offshore Services, Inc.*, 523 U. S. 75 (1998). We explained our holding as follows:

> "As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed. Title VII prohibits 'discriminat[ion] . . . because of . . . sex' in the 'terms' or 'conditions'

of employment. Our holding that this includes sexual harassment must extend to sexual harassment of any kind that meets the statutory requirements." *Id.*, at 79–80.

This approach applies outside of the discrimination context as well. In *H. J. Inc.* v. *Northwestern Bell Telephone Co.*, 492 U. S. 229 (1989), we rejected the argument that the Racketeer Influenced and Corrupt Organizations Act (RICO) should be construed to cover only "organized crime" because Congress included findings in the Act's preamble emphasizing only that problem. See Pub. L. 91–452 § 1, 84 Stat. 941. After surveying RICO's legislative history, we concluded that even though "[t]he occasion for Congress' action was the perceived need to combat organized crime, . . . Congress for cogent reasons chose to enact a more general statute, one which, although it had organized crime as its focus, was not limited in application to organized crime." 492 U. S., at 248.[3]

Under the approach we followed in *Oncale* and *H. J. Inc.*, visual impairments should be judged by the same standard as hearing impairments or any other medically controllable condition. The nature of the discrimination alleged is of the same character and should be treated accordingly.

Indeed, it seems to me eminently within the purpose and policy of the ADA to require employers who make hiring and firing decisions based on individuals' uncorrected vision to clarify why having, for example, 20/100 uncorrected vision

---

[3] The one notable exception to our use of this method of interpretation occurred in the decision in *General Elec. Co.* v. *Gilbert*, 429 U. S. 125 (1976), in which the majority rejected an EEOC guideline and the heavy weight of authority in the federal courts of appeals in order to hold that Title VII did not prohibit discrimination on the basis of pregnancy-related conditions. Given the fact that Congress swiftly "overruled" that decision in the Pregnancy Discrimination Act of 1978, 92 Stat. 2076, 42 U, S. C. § 2000e(k), I submit that the views expressed in the dissenting opinions in that case, 429 U. S., at 146 (opinion of Brennan, J.), and *id.*, at 160 (opinion of STEVENS, J.), should be followed today.

or better is a valid job requirement. So long as an employer explicitly makes its decision based on an impairment that in some condition is substantially limiting, it matters not under the structure of the Act whether that impairment is widely shared or so rare that it is seriously misunderstood. Either way, the individual has an impairment that is covered by the purpose of the ADA, and she should be protected against irrational stereotypes and unjustified disparate treatment on that basis.

I do not mean to suggest, of course, that the ADA should be read to prohibit discrimination on the basis of, say, blue eyes, deformed fingernails, or heights of less than six feet. Those conditions, to the extent that they are even "impairments," do not substantially limit individuals in any condition and thus are different in kind from the impairment in the case before us. While not all eyesight that can be enhanced by glasses is substantially limiting, having 20/200 vision in one's better eye is, without treatment, a significant hindrance. Only two percent of the population suffers from such myopia.[4] Such acuity precludes a person from driving, shopping in a public store, or viewing a computer screen from a reasonable distance. Uncorrected vision, therefore, can be "substantially limiting" in the same way that unmedicated epilepsy or diabetes can be. Because Congress obviously intended to include individuals with the latter impairments in the Act's protected class, we should give petitioners the same protection.

### III

The Court does not disagree that the logic of the ADA requires petitioners' visual impairments to be judged the same as other "correctable" conditions. Instead of including petitioners within the Act's umbrella, however, the Court

---

[4] J. Roberts, Binocular Visual Acuity of Adults, United States, 1960–1962, p. 3 (National Center for Health Statistics, Series 11, No. 30, Department of Health and Welfare, 1968).

decides, in this opinion and its companion, to expel all individuals who, by using "measures [to] mitigate [their] impairment[s]," *ante*, at 475, are able to overcome substantial limitations regarding major life activities. The Court, for instance, holds that severe hypertension that is substantially limiting without medication is not a "disability," *Murphy* v. *United Parcel Service, Inc., post*, p. 516, and—perhaps even more remarkably—indicates (directly contrary to the Act's legislative history, see *supra*, at 500–501) that diabetes that is controlled only with insulin treatments is not a "disability" either, *ante*, at 483–484.

The Court claims that this rule is necessary to avoid requiring courts to "speculate" about a person's "hypothetical" condition and to preserve the Act's focus on making "individualized inquiries" into whether a person is disabled. *Ante*, at 483. The Court also asserts that its rejection of the general rule of viewing individuals in their unmitigated state prevents distorting the scope of the Act's protected class to cover a "much higher number" of persons than Congress estimated in its findings. And, I suspect, the Court has been cowed by respondent's persistent argument that viewing all individuals in their unmitigated state will lead to a tidal wave of lawsuits. None of the Court's reasoning, however, justifies a construction of the Act that will obviously deprive many of Congress' intended beneficiaries of the legal protection it affords.

The agencies' approach, the Court repeatedly contends, "would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than individuals, [which] is both contrary to the letter and spirit of the ADA." *Ante*, at 483–484. The Court's mantra regarding the Act's "individualized approach," however, fails to support its holding. I agree that the letter and spirit of the ADA is designed to deter decisionmaking based on group stereotypes, but the agencies' interpretation of the Act does not lead to this result. Nor does it require courts to "speculate" about people's "hypothetical"

conditions. Viewing a person in her "unmitigated" state simply requires examining that individual's abilities in a different state, not the abilities of every person who shares a similar condition. It is just as easy individually to test petitioners' eyesight with their glasses on as with their glasses off.[5]

Ironically, it is the Court's approach that actually condones treating individuals merely as members of groups. That misdirected approach permits any employer to dismiss out of hand every person who has uncorrected eyesight worse than 20/100 without regard to the specific qualifications of those individuals or the extent of their abilities to overcome their impairment. In much the same way, the Court's approach would seem to allow an employer to refuse to hire every person who has epilepsy or diabetes that is controlled by medication, or every person who functions efficiently with a prosthetic limb.

Under the Court's reasoning, an employer apparently could not refuse to hire persons with these impairments who are substantially limited even with medication, see *ante*, at 487–488, but that group-based "exception" is more perverse still. Since the purpose of the ADA is to dismantle employment barriers based on society's accumulated myths

---

[5] For much the same reason, the Court's concern that the agencies' approach would "lead to the anomalous result" that courts would ignore "negative side effects suffered by an individual resulting from the use of mitigating measures," *ante*, at 484, is misplaced. It seems safe to assume that most individuals who take medication that itself substantially limits a major life activity would be substantially limited in some other way if they did not take the medication. The Court's examples of psychosis, Parkinson's disease, and epilepsy certainly support this presumption. To the extent that certain people may be substantially limited only when taking "mitigating measures," it might fairly be said that just as contagiousness is symptomatic of a disability because an individual's "contagiousness and her physical impairment each [may result] from the same underlying condition," *School Bd. of Nassau Cty.* v. *Arline*, 480 U. S. 273, 282 (1987), side effects are symptomatic of a disability because side effects and a physical impairment may flow from the same underlying condition.

and fears, see 42 U. S. C. § 12101(a)(8); *Arline,* 480 U. S., at 283–284, it is especially ironic to deny protection for persons with substantially limiting impairments that, when corrected, render them fully able and employable. Insofar as the Court assumes that the majority of individuals with impairments such as prosthetic limbs or epilepsy will still be covered under its approach because they are substantially limited "notwithstanding the use of a corrective device," *ante,* at 488, I respectfully disagree as an empirical matter. Although it is of course true that some of these individuals are substantially limited in any condition, Congress enacted the ADA in part because such individuals are *not* ordinarily substantially limited in their mitigated condition, but rather are often the victims of "stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U. S. C. § 12101(a)(7).

It has also been suggested that if we treat as "disabilities" impairments that may be mitigated by measures as ordinary and expedient as wearing eyeglasses, a flood of litigation will ensue. The suggestion is misguided. Although vision is of critical importance for airline pilots, in most segments of the economy whether an employee wears glasses—or uses any of several other mitigating measures—is a matter of complete indifference to employers. It is difficult to envision many situations in which a qualified employee who needs glasses to perform her job might be fired—as the statute requires—"because of," § 12112, the fact that she cannot see well without them. Such a proposition would be ridiculous in the garden-variety case. On the other hand, if an accounting firm, for example, adopted a guideline refusing to hire any incoming accountant who has uncorrected vision of less than 20/100—or, by the same token, any person who is unable without medication to avoid having seizures—such a rule would seem to be the essence of invidious discrimination.

In this case the quality of petitioners' uncorrected vision is relevant only because the airline regards the ability to see

without glasses as an employment qualification for its pilots. Presumably it would not insist on such a qualification unless it has a sound business justification for doing so (an issue we do not address today). But if United regards petitioners as unqualified because they cannot see well without glasses, it seems eminently fair for a court also to use uncorrected vision as the basis for evaluating petitioners' life activity of seeing.

Under the agencies' approach, individuals with poor eyesight and other correctable impairments will, of course, be able to file lawsuits claiming discrimination on that basis. Yet all of those same individuals can already file employment discrimination claims based on their race, sex, or religion, and—provided they are at least 40 years old—their age. Congress has never seen this as reason to restrict classes of antidiscrimination coverage. Indeed, it is hard to believe that providing individuals with one more antidiscrimination protection will make any more of them file baseless or vexatious lawsuits. To the extent that the Court is concerned with requiring employers to answer in litigation for every employment practice that draws distinctions based on physical attributes, that anxiety should be addressed not in this case, but in one that presents an issue regarding employers' affirmative defenses.

In the end, the Court is left only with its tenacious grip on Congress' finding that "some 43,000,000 Americans have one or more physical or mental disabilities," 42 U. S. C. § 12101(a)(1)—and that figure's legislative history extrapolated from a law review "article authored by the drafter of the original ADA bill introduced in Congress in 1988." *Ante*, at 484. We previously have observed that a "statement of congressional findings is a rather thin reed upon which to base" a statutory construction. *National Organization for Women, Inc. v. Scheidler*, 510 U. S. 249, 260 (1994). Even so, as I have noted above, I readily agree that the agencies' approach to the Act would extend coverage to more than that number of people (although the Court's lofty esti-

mates, see *ante,* at 487, may be inflated because they do not appear to exclude impairments that are not substantially limiting). It is equally undeniable, however, that "43 million" is not a fixed cap on the Act's protected class: By including the "record of" and "regarded as" categories, Congress fully expected the Act to protect individuals who lack, in the Court's words, "actual" disabilities, and therefore are not counted in that number.

What is more, in mining the depths of the history of the 43 million figure—surveying even agency reports that predate the drafting of any of this case's controlling legislation—the Court fails to acknowledge that its narrow approach may have the perverse effect of denying coverage for a sizeable portion of the core group of 43 million. The Court appears to exclude from the Act's protected class individuals with controllable conditions such as diabetes and severe hypertension that were expressly understood as substantially limiting impairments in the Act's Committee Reports, see *supra,* at 500–501—and even, as the footnote in the margin shows, in the studies that produced the 43 million figure.[6] Given the inability to make the 43 million figure fit any consistent method of interpreting the word "disabled," it would be far wiser for the Court to follow—or at least to mention— the documents reflecting Congress' contemporaneous understanding of the term: the Committee Reports on the actual legislation.

---

[6] See National Council on Disability, Toward Independence 12 (1986) (hypertension); U. S. Dept. of Commerce, Bureau of Census, Disability, Functional Limitation, and Health Insurance Coverage: 1984/85, p. 51 (1986) (hypertension, diabetes); National Institute on Disability and Rehabilitation Research, Data on Disability from the National Health Interview Survey 1983–1985, p. 33 (1988) (epilepsy, diabetes, hypertension); U. S. Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States 114–115 (1989) (Tables 114 and 115) (diabetes, hypertension); Mathematica Policy Research, Inc., Digest of Data on Persons with Disabilities 3 (1984) (hypertension, diabetes).

## IV

Occupational hazards characterize many trades. The farsighted pilot may have as much trouble seeing the instrument panel as the nearsighted pilot has in identifying a safe place to land. The vision of appellate judges is sometimes subconsciously obscured by a concern that their decision will legalize issues best left to the private sphere or will magnify the work of an already-overburdened judiciary. See *Jackson* v. *Virginia*, 443 U. S. 307, 326, 337–339 (1979) (STEVENS, J., dissenting). Although these concerns may help to explain the Court's decision to chart its own course—rather than to follow the one that has been well marked by Congress, by the overwhelming consensus of circuit judges, and by the Executive officials charged with the responsibility of administering the ADA—they surely do not justify the Court's crabbed vision of the territory covered by this important statute.

Accordingly, although I express no opinion on the ultimate merits of petitioners' claim, I am persuaded that they have a disability covered by the ADA. I therefore respectfully dissent.

JUSTICE BREYER, dissenting.

We must draw a statutory line that either (1) will include within the category of persons authorized to bring suit under the Americans with Disabilities Act of 1990 some whom Congress may not have wanted to protect (those who wear ordinary eyeglasses), or (2) will exclude from the threshold category those whom Congress certainly did want to protect (those who successfully use corrective devices or medicines, such as hearing aids or prostheses or medicine for epilepsy). Faced with this dilemma, the statute's language, structure, basic purposes, and history require us to choose the former statutory line, as JUSTICE STEVENS (whose opinion I join) well explains. I would add that, if the more generous choice of threshold led to too many lawsuits that ultimately proved

without merit or otherwise drew too much time and attention away from those whom Congress clearly sought to protect, there is a remedy. The Equal Employment Opportunity Commission (EEOC), through regulation, might draw finer definitional lines, excluding some of those who wear eyeglasses (say, those with certain vision impairments who readily can find corrective lenses), thereby cabining the overly broad extension of the statute that the majority fears.

The majority questions whether the EEOC could do so, for the majority is uncertain whether the EEOC possesses typical agency regulation-writing authority with respect to the statute's definitions. See *ante*, at 479–480. The majority poses this question because the section of the statute, 42 U. S. C. § 12116, that says the EEOC "shall issue regulations" also says these regulations are "to carry out *this subchapter*" (namely, § 12111 to § 12117, the employment subchapter); and the section of the statute that contains the three-pronged definition of "disability" precedes *"this* subchapter," the employment subchapter, to which § 12116 specifically refers. (Emphasis added.)

Nonetheless, the employment subchapter, *i. e.,* *"this* subchapter," includes other provisions that use the defined terms, for example a provision that forbids "discriminat[ing] against a qualified individual with a disability because of the disability." § 12112(a). The EEOC might elaborate, through regulations, on the meaning of "disability" in this last-mentioned provision, if elaboration is needed in order to "carry out" the substantive provisions of "this subchapter." An EEOC regulation that elaborated on the meaning of this use of the word "disability" would fall within the scope *both* of the basic definitional provision and also the substantive provisions of *"this"* later subchapter, for the word "disability" appears in both places.

There is no reason to believe that Congress would have wanted to deny the EEOC the power to issue such a regulation, at least if the regulation is consistent with the earlier

statutory definition and with the relevant interpretations by other enforcement agencies. The physical location of the definitional section seems to reflect only drafting or stylistic, not substantive, objectives. And to pick and choose among which of *"this* subchapter['s]" words the EEOC has the power to explain would inhibit the development of law that coherently interprets this important statute.