# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

**FILED**

**September 29, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **JOHN DAVIS,** | ) | |
| | ) | |
| Plaintiff/Appellant, | ) | Davidson Circuit No. 97C-1823 |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COMPUTER MAINTENANCE** | ) | Appeal No. 01A01-9809-CV-00459 |
| **SERVICE, INC.,** | ) | |
| | ) | |
| Defendant/Appellee. | ) | |

## APPEAL FROM THE CIRCUIT COURT OF DAVIDSON COUNTY
## AT NASHVILLE, TENNESSEE

### THE HONORABLE WALTER C. KURTZ, JUDGE

For the Plaintiff/Appellant:

B. Keith Williams
Brody N. Kane
Lebanon, Tennessee

For the Defendant/Appellee:

James D. Kay, Jr.
John B. Enkema
Nashville, Tennessee

**AFFIRMED**

HOLLY KIRBY LILLARD, J.

CONCURS:

W. FRANK CRAWFORD, P.J., W.S.

DAVID R. FARMER, J.

**OPINION**

This is an employment disability discrimination case. The plaintiff employee filed suit against the defendant employer, alleging that he was wrongfully terminated shortly after he was hired because of his diabetes, in violation the Tennessee Handicap Act. The trial court granted summary judgment in favor of the defendant employer, finding that the plaintiff proffered insufficient evidence that his termination was wrongfully based on his handicap. We affirm, finding that the plaintiff's condition does not constitute a "handicap" under the Tennessee Act, based on *Sutton v. United Airlines, Inc.*, 527 U.S. _____, 119 S. Ct. 2139 (1999), decided after the trial court's decision in this case.

Plaintiff/Appellant, John Davis ("Davis"), was hired as a purchasing agent by Defendant/Appellee, Computer Maintenance Service, Inc. ("CMS"), on June 24, 1996. The job for which Davis was hired required him to order and price parts over the phone, return defective merchandise to manufacturers, receive incoming parts, issue parts, and lift heavy equipment such as computer monitors. Davis is an insulin dependent diabetic and must take multiple daily insulin injections. He also takes an oral medication to aid in digestion. A side effect of the oral medication is a frequent dry cough. At the June 24 interview, Davis told CMS about his medical condition.

Davis began work on July 1, 1996. He stored his insulin in the refrigerator located in the CMS break room. On July 3, 1996, after a meeting with a CMS supervisor, CMS fired Davis. Davis contends that CMS terminated him because of his diabetes, based on comments made to him about his medical condition by the CMS supervisor at the meeting at which he was terminated.

Davis filed a lawsuit on June 9, 1997 naming CMS as the sole defendant. The complaint alleged that at the meeting at which Davis was terminated, the CMS supervisor who terminated Davis, David Bender ("Bender"), voiced concerns about Davis' diabetes. Bender also allegedly had concerns about other employees sharing the same work area with Davis and did not believe that Davis could perform the tasks required for his position. Davis maintained that CMS violated the Tennessee Handicap Act ("THA"), codified at Tennessee Code Annotated § 8-50-103. Davis also asserted claims for negligent hiring or supervision, intentional and negligent infliction of emotional distress, retaliatory discharge, and outrageous conduct. In the complaint, Davis sought $500,000 in compensation for impairment of his earning capacity, loss of future income, loss of back pay, loss of medical insurance benefits, loss of life insurance coverage, loss of opportunity for advancement and "serious humiliation and embarrassment causing severe mental anguish." The complaint sought

$1,000,000 in punitive damages for the alleged intentional, willful, and malicious actions of CMS, as well as attorney's fees.

The answer filed by CMS admitted that any statements made by a CMS supervisor would be imputed to CMS through the doctrine of respondeat superior, but denied that Bender made any discriminatory remarks to Davis. CMS denied all other claims asserted in Davis' complaint. In addition, CMS raised several defenses, including failure to state a claim upon which relief may be granted, and asserted that Davis was unable to adequately perform the duties of the job for which he was hired.

After discovery was conducted, CMS filed a motion for summary judgment. The summary judgment motion asserted that Davis was fired because he "had problems lifting and moving the computer inventory and was insubordinate and arrogant." CMS denied that it terminated Davis solely because of his diabetes. In the alternative, CMS claimed that it was entitled to summary judgment because Davis was not "handicapped" and because CMS did not regard Davis as having an impairment that substantially limited a major life activity. CMS asserted that there were no facts to support Davis' claims for negligent hiring and supervision, retaliatory discharge, intentional and negligent infliction of emotional distress or punitive damages. In support of its motion, CMS filed the depositions of Davis, Bender and several CMS employees.

In CMS' memorandum of law filed in support of its motion for summary judgment, CMS argued that, under the Tennessee handicap discrimination statute, a plaintiff has to prove he or she was fired *solely* because of a handicap. CMS maintained that the proof showed that it fired Davis because of lifting problems and insubordination, and therefore did not violate the Tennessee statute. Second, CMS asserted that Davis could not be considered "handicapped" under the Tennessee statute because he had submitted no proof that his condition substantially limits a major life activity, nor had he submitted evidence that CMS regarded him as having an impairment that substantially limits a major life activity.

In response to CMS' summary judgment motion, Davis asserted that CMS' proffered reasons for his termination were not legitimate since he was not told these reasons at the time of termination. Davis also asserted that he adequately performed the required job duties, including

2

lifting, and was not arrogant or disrespectful. Accordingly, Davis argued that there was a genuine issue of material fact regarding whether he was terminated solely because of his diabetes.

Davis asserted that he is "handicapped" under the Tennessee statute because he must administer daily insulin shots and must comply with a proper diet and exercise program. He also asserted that the alleged statements made by Bender at the meeting at which he was fired demonstrated that CMS regarded him as impaired.

In opposition to CMS' motion for summary judgment, Davis filed his affidavit, in which he stated that his diabetes did not interfere with the performance of his job duties. He denied being disrespectful or having trouble taking direction from CMS supervisors.

In Davis' deposition, he testified about his initial interview with CMS employee Janet Baxter ("Baxter"). Davis testified that he told Baxter about his diabetes, and that, because of the diabetes, he would need insurance coverage. Davis said that Baxter assured him that, if he currently had insurance, there would be no problem with CMS insuring him. Davis understood from Baxter that he would be eligible for health insurance immediately, and was not told of any waiting period. He also understood that CMS had a 120 day probation period in which he could be fired for performance reasons. Davis testified that, at the time he was hired, he did not feel that his diabetes was a handicap or that his condition prohibited him from performing any of the job duties.

In his deposition, Davis testified that after working two and one-half days, Bender called Davis into the conference room to talk. Davis and Bender were the only persons present. Davis said that Bender commented on Davis' insulin in the refrigerator and asked him if he was a diabetic. Bender also questioned Davis about his cough. Davis testified that when he told Bender about the cough, Bender told him that it was not acceptable and that he was going to terminate Davis. Davis said that Bender felt that he could not perform the functions of his position, expressed concern about the well being of other employees, and said it was necessary to terminate Davis. Davis then left the meeting and went home. Davis claimed that he was never told of any dissatisfaction about his job performance, nor was he told that his diabetes interfered with his job performance. Davis denied

3

that he almost dropped a monitor. When asked why he thought he was discriminated against, Davis stated,

> The reason I think I was discriminated against was because the folks in this company when they contacted their insurance company found out how much it was going to cost to insure an insulin-dependent diabetic and they decided they weren't going to invest that kind of money in a new employee.

When asked about proof to support this assertion, Davis replied, "That's what I feel, because I gave them no reason to fire me."

Davis testified in his deposition that, after he was terminated by CMS, he had no health insurance until the summer of 1997 when he obtained insurance through TennCare. During the time in which he was uninsured, Davis calculated that he incurred approximately $12,000 in medical bills.

In support of its motion for summary judgment, CMS relied on the depositions of CMS employees allegedly showing that it had legitimate non-discriminatory reasons for firing Davis. Bender, the shop manager and CMS supervisor who terminated Davis, testified that he knew that Davis was a diabetic at the meeting at which Davis was terminated because Davis told him when Bender questioned Davis about his cough. Bender said that, on Davis' second day of work, someone mentioned to him Davis' frequent cough and he became concerned. Bender denied asking Davis about insulin in the refrigerator. He stated that he saw Davis falter on two separate occasions while lifting monitors. He conceded that Davis succeeded in placing the monitors in boxes as was required, but felt that Davis looked unsteady. Bender said it was immediately obvious to him that "lifting was going to be a very serious limitation there." Bender stated, however, that "[t]o the best of my knowledge, . . . he was performing the tasks that we hired him to do."

Bender testified that when he asked Davis to meet with him, he originally intended only to ask Davis about the cough, but when Davis became defensive, agitated, and disrespectful, he fired him. Bender said that the meeting:

> ended very abruptly. [Davis] said, well, what, you going to release me? You know, and at this point -- and he -- and I'm already mad. I don't need these -- you know, I'm, I'm your boss, I don't need you talking to me this way, yes, I'm going to release you, you know. He got up, left.

Bender stated that it was his decision to fire Davis and that no one at CMS directed him to fire Davis.

Stephen Vire, the President of CMS, said that he also saw Davis almost drop a monitor. He also noticed that Davis' cough "impeded him being able to carry on phone conversations, which is a lot of that job." When Bender asked Mr. Vire his opinion of Davis, Mr. Vire told Bender about both of these concerns. Mr. Vire also testified that Davis had trouble taking direction from his direct supervisor, Pom Norris. However, Mr. Vire did not believe that Davis failed to do any job duties that he was asked to do. Mr. Vire maintained that he did not know Davis was a diabetic until he was interviewed by the EEOC.

Dianne Vire, the CEO of CMS and Stephen Vire's spouse, testified that Pom Norris, the employee who trained Davis, told her that Davis "was very argumentative, opinionated, and did not want to do things by the company policy." Mrs. Vire was told by both Pom Norris and Bender that Davis was having trouble lifting equipment. Mrs. Vire stated that neither she nor any other CMS employee checked on insurance premiums for Davis. Mrs. Vire filled out Davis' separation notice. On the separation notice, she listed the reasons for termination as: "Argumentative with trainer, he knew it all, caught CMS on fire, smoking and throwing cigarettes in mulch, CMS is a nonsmoking environment, not capable of job duties as led to believe during the interview process."

Manaswee (Pom) Norris ("Norris"), was an accountant for CMS who sometimes performed purchasing duties. Norris trained Davis. Norris testified in her deposition that Davis coughed often. On a loudness scale of one to ten, Norris rated the cough at an eight. She testified that Davis failed to properly tag incoming parts, and that, on Davis' second day of work, he did not receive the incoming parts in a timely manner as the job required. She thought Davis seemed like a "know-it-all" because he did not take notes when she was training him. She did not think he was capable of doing the job at CMS because he spent all his time ordering parts instead of receiving them. She also noted that Davis "fussed" a lot about noise levels and about people failing to put parts back. She testified that Davis was a slow worker and did not follow the CMS procedures for the job. As a result, Norris said that she had to receive parts, which was not her job. She did not remember any occasions on which Davis had trouble talking on the phone or had to stop in mid-sentence to cough while talking on the phone. Norris did not see Davis struggle and almost drop a monitor. Norris testified that she did not call CMS' insurance agent to determine the cost of health insurance for Davis.

Based on this record, the trial court considered CMS' motion for summary judgment. The

trial court found that the record contained no evidence to support Davis' claims for retaliatory discharge, outrageous conduct, intentional or negligent infliction of emotional distress, negligent hiring or supervision, or punitive damages. Therefore, the trial court granted CMS' motion for summary judgment on these claims.

On Davis' handicap discrimination claim, the trial court found that Davis was handicapped as defined by Tennessee Code Annotated, but that Davis proffered insufficient evidence that CMS fired him because of his handicap. The trial court reasoned that, under *St. Mary's Honor Center v. Hicks*, 509 U.S. 508, 113 S. Ct. 2742 (1993), Davis was required to "show evidence sufficient for the fact finder reasonably to conclude that the employer's decision to discharge him or her was wrongfully based on the handicap . . . the plaintiff cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of discriminatory animus on the part of the employer." Citing *Pruett v. Wal-Mart Stores, Inc.*, No. 02A01-9610-CH-00266, 1997 WL 729260 (Tenn. App. No. 25, 1997), the trial court found that Davis could not survive summary judgment by asserting that he must have been fired due to his handicap simply because the reasons given for his termination were untrue. Consequently, the trial court granted CMS' motion for summary judgment on the handicap discrimination claim as well.

On appeal, Davis argues that summary judgment was inappropriate because there is a genuine issue of material fact as to whether he is handicapped and whether he has sufficient evidence to support his cause of action under the Tennessee Handicap Act. He also asserts on appeal that he submitted sufficient proof to survive summary judgment on his claims for retaliatory discharge, outrageous conduct, intentional or negligent infliction of emotional distress, negligent hiring or supervision of employees, and punitive damages.

A motion for summary judgment should be granted when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. *See id.* In *Byrd v. Hall*, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

6

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 [now Rule 56.06] provides that the nonmoving party cannot simply rely upon his pleadings but must set forth specific facts showing that there is a genuine issue of material fact for trial.

*Id.* at 211 (citations omitted).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. *See Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. *See Bain*, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is *de novo* on the record before this Court. *See Warren v. Estate of Kirk*, 954 S.W.2d 722, 723 (Tenn. 1997).

In this case, the trial court found that Davis was handicapped within the meaning of the Tennessee Handicap Act ("THA"), Tennessee Code Annotated § 8-50-103 (1993). However, since the trial court rendered its decision in this case, the United States Supreme Court issued a decision clarifying the definition of "disability" under the comparable federal disability discrimination statutes. *See Sutton v. United Air Lines, Inc.*, 527 U.S. _____, 119 S.Ct. 2139 (1999). Consequently, in light of *Sutton*, we must examine whether Davis would be considered "handicapped" under the Tennessee statute.

The pertinent provision of the THA provides:

> There shall be no discrimination in the hiring, firing and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-50-103(a) (1993). The THA does not define "handicap." Therefore, Tennessee courts look to three sources for interpretation of this term: (1) the Tennessee Human Rights Act definition of handicap, codified at Tennessee Code Annotated § 4-21-102(9); (2) the comparable federal statutes, the American with Disabilities Act, 42 U.S.C.A. § 12102(2), and the Rehabilitation Act, 29 U.S.C.A. § 706(8); and (3) federal and state case law interpreting these statutes. *See Barnes v. Goodyear Tire & Rubber Co.*, No. 02A01-9707-CH-00157, 1998 WL 345449 (June 30, 1998) (*perm to app granted Jan. 11, 1999*).

7

Davis argues that his diabetes constitutes a "handicap" under the definition of "handicap" in the Tennessee Human Rights Act ("THRA"), Tennessee Code Annotated § 4-21-102(9). Under this definition, "handicap" means:

> (i) A physical or mental impairment which substantially limits one (1) or more of such person's major life activities;
> (ii) A record of having such an impairment; or
> (iii) Being regarded as having such an impairment;

Tenn. Code Ann. § 4-21-102(9) (1998). "Major life activities" are defined as "[F]unctions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Cecil v. Gibson*, 820 S.W.2d 361, 364 (Tenn. App. 1991) (quoting 29 C.F.R. § 1613, 702 (c) (1990)). The definition of handicap in the THRA is virtually identical to the federal definitions of disability found in the ADA and the Rehabilitation Act. Thus, cases interpreting the federal statutes are particularly helpful to Tennessee courts interpreting the state's definition of handicap. *Id.*

Davis asserts that he satisfies all three prongs of the handicap definition. Davis argues that the first prong is satisfied because his diabetes is "a physical condition which substantially limits major life activities," noting that he must administer insulin shots, take oral medication, monitor his condition, and comply with a strict diet and exercise program. Davis does not name the "major life activity" which is substantially limited by his diabetes, and asserts that his diabetes did not prevent him from performing his job duties. Davis maintains that the second prong is satisfied because he has been diabetic for twenty years and thus has "a record" of having an impairment that substantially limits a major life activity.

Davis also argues that the evidence shows that he satisfies the third prong of the definition, because CMS "regarded" him as having an impairment that substantially limits a major life activity. Davis maintains that Bender's comments about his diabetes showed that he "perceived that his diabetic condition may have limited his work performance."

In response, CMS asserts that Davis has presented no proof that he is substantially limited in a major life activity, but simply requests the Court to take judicial notice that diabetes substantially limits a major life activity. Thus, CMS argues that Davis does not satisfy the definition of "handicap." We will consider this issue in light of *Sutton v. United Airlines, Inc.*

8

In *Sutton*, two visually impaired twins with identical uncorrected vision of 20/200 or worse filed suit against a commercial airline under the American with Disabilities Act ("ADA"). The airline had rejected the twins for employment as pilots because they did not meet the airline's minimum vision requirements, which required uncorrected visual acuity of 20/100 or better. Both the district court and the Tenth Circuit dismissed the plaintiffs' complaint, finding that the plaintiffs could not prove that they had a "disability" because they failed to show that they were substantially limited in a major life activity such as working. The plaintiffs appealed to the United States Supreme Court.

On appeal, the pivotal issue in *Sutton* was "whether disability is to be determined with or without reference to corrective measures" such as glasses or contact lenses. *Sutton*, 119 S. Ct. at 2146. The plaintiffs argued that the issue of whether a litigant's impairment substantially limits a major life activity should be determined without regard to corrective measures. They noted regulations and interpretive guidelines promulgated by the Equal Employment Opportunity Commission ("EEOC") which stated that disability should be determined "without regard to mitigating measures such as medicines, or assistive or prosthetic devices." *Id.* at 2145 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998)).

The Supreme Court rejected the approach in the EEOC Guidelines. *Id.* at 2146. It noted that the Act requires a present, not a hypothetical, limitation on a major life activity, and found that a person whose impairment is corrected by medication is not presently limited. *Id.* It also observed that the determination of whether a person has a disability is an individualized inquiry. It found that adopting the approach in the EEOC Guidelines ran counter to the required individualized inquiry, and utilized diabetes as an example:

> For instance, under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus, the guidelines approach would create a system in which persons often must be treated

as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and spirit of the ADA.

*Id.* at 2147. The Supreme Court also noted that the approach in the EEOC Guidelines would mean that employers could not take into account negative side effects from the mitigating measures, such as seizures from antipsychotic drugs. *Id.* The Court also found this "inconsistent with the individualized approach of the ADA." *Id.*

The Court then described the appropriate inquiry to determine whether a person who uses corrective measures has a "disability" under the first prong of the test, that is, a physical impairment that substantially limits a major life activity. The Court stated that "one has a disability under subsection A [the first prong] if, notwithstanding the use of a corrective device, that individual is substantially limited in a major life activity." *Id.* at 2149. Based on this analysis, the Court concluded that the plaintiffs in *Sutton* were not disabled under the first prong of the definition of "disability." *Id.*

The Court in *Sutton* then discussed the third prong of the definition of disability, under which a person may be found disabled if he is "regarded as having" an impairment that substantially limits a major life activity. The Court observed that a disability may be found if an employer "mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Id.* at 2150. In *Sutton*, the plaintiffs argued that the defendant airline mistakenly believed that their visual impairment, remedied with corrective measures, substantially limited them in the major life activity of working, specifically, working as a global airline pilot. *Id.*

The Court in *Sutton* observed that "there may be some conceptual difficulty in defining 'major life activities' to include work" because it leads to circular reasoning that if a person is excluded because of an impairment from working with others, " 'then that exclusion constitutes an impairment. . . .'" *Id.* at 2151 (quoting Tr. of Oral Arg. in *School Board of Nassau Co. v. Arline*, O. T. 1986 No. 85-1277, p. 15 (argument of Solicitor General)). The Court assumed, without deciding, that working is a major life activity, but found nevertheless that the plaintiffs did not meet the "regarded as" prong of the definition of disability. *Id.* It noted that even if "working" is considered one of the major life activities, "[t]o be substantially limited in the major life activity of working, . . . one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* The Court found that the *Sutton* plaintiffs had alleged only that the airline

10

regarded their poor vision as precluding them from a position as "global airline pilot." *Id.* The Court stated: "Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a substantially limiting impairment." *Id.* Therefore, the Court affirmed the dismissal of the plaintiffs' claims. *Id.* at 2152.

As noted above, Tennessee courts have found that federal case law construing the federal discrimination statutes is "an important source of guidance." *Cecil v. Gibson*, 820 S.W.2d 361, 364 (Tenn. App. 1991). Indeed, Tennessee courts "utilize[] federal decisions construing parallel employment law. . . ." *Pruett*, 1997 WL 729260 at *12 (Tenn. App. Nov. 25, 1997). The reasoning in *Sutton* is in line with the Tennessee Handicap Act and it is therefore appropriate to adopt its analysis of the federal definition of disability in construing the THA.

Utilizing the reasoning in *Sutton*, Davis would clearly not meet the first prong of the definition of "handicap" set forth in the THRA. Davis notes that he must utilize corrective measures, such as insulin shots and oral medication, but identifies no major life activity which is substantially limited by his diabetes. As noted in *Sutton*, a "diabetic whose illness does not impair his . . . daily activities" should not be considered disabled "simply because he . . . has diabetes." *Sutton*, 119 S.Ct. at 2147. Under this analysis, Davis meets neither the first nor the second ("record of an impairment") prong of the definition of "handicap."

Davis argues that he meets the third prong of the definition of "handicap," because CMS "regarded" him as handicapped, that is, CMS regarded him as having an impairment that substantially limited the major life activity of working. *See Cecil*, 820 S.W.2d at 366; *Barnes v. Goodyear Tire and Rubber Co.*, No. 02A01-9707-CH-00157, 1998 WL 345449 (Tenn App. June 20, 1998).

As did the Court in *Sutton*, we acknowledge some conceptual difficulty in recognizing "working" as a major life activity under the definition of "handicap," in that it tends to lead to circular reasoning. *Sutton*, 119 S. Ct. at 2151. However, even assuming that "working" is a major life activity under Tennessee's definition of "handicap," Davis identifies no broad class of job that he is "regarded as" being unable to perform. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege that they are unable to work in a broad class of jobs." *Id.* The Equal Employment

Commission has explained that "substantially limits" in reference to the major life activity of working means:

> . . . significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.* (quoting C.F.R. § 1630.2(j)(3)(i)). Accordingly, Davis must show that CMS regarded his diabetes as an impairment that substantially limits him in "more than one type of job, a specialized job, or a particular job choice." *Id.* Davis must show that (1) CMS perceived Davis as having an impairment, and that (2) CMS perceived the impairment as substantially limiting a major life activity.

Since this is an appeal from a grant of summary judgment, we must take the strongest legitimate view of the evidence in favor of Davis. *See Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1993). Davis disputes CMS' assertion that he had trouble lifting computer monitors, that he had trouble taking directions, that he was argumentative, opinionated, "know-it-all," defensive or disrespectful, or that he "did not want to do things by company policy." Viewing the evidence in the light most favorable to Davis, he asserts that Bender asked him about the persistent cough that resulted from the oral medication Davis takes to aid his digestion. Davis acknowledges that Bender told him that he did not feel that Davis could perform the requirements of the job for which he was hired. Davis asserts, without factual foundation, his belief that CMS fired him because it was concerned about the cost of insurance for a diabetic employee.

Under the analysis in *Sutton*, CMS could legitimately consider negative side effects resulting from the use of corrective measures, such as the side effects from medication. *Sutton*, 119 S. Ct. at 2147. Davis acknowledges that his medication resulted in his having a persistent dry cough. It is undisputed that talking on the telephone was a substantial part of the job duties of the position for which Davis was hired.

Moreover, while Davis asserts that the evidence demonstrates that CMS regarded his diabetes as substantially limiting him in the major life activity of working, he identifies no broad class of jobs in which he was regarded as unable to work. Viewing the evidence as a whole, in the light most favorable to Davis, the fact-finder could not reasonably infer that CMS "mistakenly believe[d] that

12

an actual, nonlimiting impairment substantially limit[ed]" Davis, rendering him "unable to work in a broad class of jobs." *Id.* at 2150-51.

Thus, Davis fails to meet any of the three prongs of the definition of "handicap" applicable to claims under the Tennessee Handicap Act. On this basis, the trial court's grant of summary judgment to CMS on Davis' claim of handicap discrimination was appropriate. This holding pretermits the issue of whether Davis was fired solely because of his diabetes.

Davis also contends that the trial court erred in granting summary judgment in favor of CMS on his claims for negligent hiring or supervision of employees, retaliatory discharge, intentional and negligent infliction of emotional distress and outrageous conduct. The trial court found that Davis presented no evidence to support a cause of action for these claims. Other than conclusory allegations that CMS' conduct provides sufficient basis for these causes of action, Davis presents no facts that would support a cause of action on any of these claims. The trial court is affirmed on this issue.

The decision of the trial court is affirmed. Costs are taxed to Appellant, for which execution may issue if necessary.

_____
                                HOLLY KIRBY LILLARD, J.

_____

CONCUR:


_____
W. FRANK CRAWFORD, P. J., W.S.


_____
DAVID R. FARMER, J.