# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 01-2821

MICHAEL DYKE,

*Plaintiff-Appellant,*

v.

O'NEAL STEEL, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:00-CV-0092—**Roger B. Cosbey**, *Magistrate Judge.*

———————

ARGUED JANUARY 10, 2002—DECIDED MAY 5, 2003

———————

Before HARLINGTON WOOD, JR., RIPPLE, and ROVNER,
*Circuit Judges.*

HARLINGTON WOOD, JR., *Circuit Judge.* Appellant
Michael Dyke lost his left eye in 1989 after an attempted
mugging. Since 1993, Dyke has suffered from Nerve
Response Syndrome Disorder ("NRSD"), a condition which
causes constant pain in Dyke's left shoulder and hip and
creates a feeling as though his leg and shoulder are con-
stantly asleep. Dyke has been receiving Social Security
Disability Benefits since 1994. Dyke's initial disability
finding was based on alcohol abuse. In 1996, Dyke filed an
application for a redetermination of disability, after being
informed that, because of a change in the law governing
disability benefits, his benefits would end on January 1,

1997. In his 1996 application, Dyke sought benefits based on his significantly reduced ability to use his left leg and arm due to a reflex sympathetic disorder ("RSD"). The disability hearing officer determined that Dyke was disabled, noting that he suffered from "significant disorganization of motor function which has resulted in his need to use a cane to walk and in reduced strength in his left arm."

Despite his disability, since 1996, Dyke has worked at various jobs through temporary agencies. On October 19, 1998, Dyke injured his back while working at Midwest Tile and Concrete through a temporary agency. As a result of this injury, Dyke underwent physical therapy and was placed on a ten-pound lifting restriction.

On October 24, 1998, Dyke submitted a Report of Continuing Disability to the Social Security Administration. In the report, Dyke stated that he could not stand or sit for long periods of time, had limited use of his left arm, and was "still blind in [his] left eye." He said that his condition had worsened since 1996 and was unbearable at times. In response to a question asking "Do you feel you are able to return to work?" Dyke checked the box marked "No." Dyke explained,

> All I can say about my situation is, there are only very few things that I can do, do [sic] to RSD in my left leg and arm, I try, but it is almost impossible. Don't get me wrong I'm not giving up in no way, but theres [sic] not a whole lot I can do but I keep trying regardless.

In response to a question asking "Since you became disabled, have you done any work?" Dyke marked the box reading "No." Dyke stated that he could not lift more than ten to fifteen pounds, that he could not tuck in his shirt using his left hand, and that it was hard for him to move his arm high enough to wash his hair.

On October 27, 1998, Dyke returned to the doctor who was treating him for his back injury. After that appoint-

ment, the doctor believed Dyke could return to work with modified duties. The sheet listing Dyke's restrictions noted that Dyke should "minimize bending, reaching, squatting, twisting, or climbing," "not lift over 20 lbs.," and "alternate between sitting and standing as needed."

On November 30, 1998, Blue Jean Jobs, a temporary agency, assigned Dyke to a temporary position at O'Neal Steel ("O'Neal"), a metal services company which purchases, inventories, processes, and ships various types of metal and metal parts to end users. Dyke's job at O'Neal required him to take twelve-foot-by-six-foot pieces of sheet metal off of a pallet, place them on a conveyor system to shear them, and then place the sheared sheets back on a pallet. He also placed metal pieces in a bender and used a punch press, lathe machine, tumbler, hand-held grinding tool, and a manual pump pallet jack. In addition to the metal work, Dyke was assigned clean-up duties which required him to sweep floors and do general cleaning in the warehouse.

During the time Dyke worked at O'Neal, he did not wear either his prosthetic eye or an eye patch. Dyke explained that he left his prosthetic eye out while working at O'Neal because he did not want to get metal shavings, grease, or oil on it. Dyke testified in his deposition that, after he had been working at O'Neal for two weeks, he was encouraged by his supervisor to apply for a full-time material handler position at the company. Dyke obtained an employment application, but when he tried to submit his completed application to Personnel Assistant Devara Harter, the following conversation, as recounted by Dyke in his deposition, occurred:

> . . . as I took it back to her, she looked up at me, and she goes, well, we can't hire you. I says, well, why is that? She goes, well, you only got one eye. And I says, beg your pardon? She goes, no, we can't hire you,

because our insurance won't cover you because you only got one eye. I says, ma'am, do you realize I've been working here for two weeks and two days? She goes, well, I'm sorry, she goes, but we can't hire you.

Harter, in her deposition, stated, when Dyke brought in his completed application, she thought that he looked "different," prompting her to ask whether he only had one eye. According to Harter, Dyke replied in the affirmative, and Harter then asked whether the people in the warehouse knew of Dyke's impairment. Harter testified that Dyke again replied in the affirmative. In her deposition, Harter explained her reaction when Dyke tried to submit his application as follows: "I just thought it looked odd and I just wanted to know what was wrong, or was there a problem."

Before being hired as a permanent employee at O'Neal, an applicant must pass vision and physical abilities tests as well as a criminal background check. The physical and vision tests set minimum standards which help ensure the safety of employees in the warehouse, where large, heavy, and potentially sharp pieces of metal protrude at many different angles and heavy equipment is operating. If a temporary employee has been working at O'Neal for thirty days, he must submit to the tests established for permanent employees. According to Shawn Smith, Vice-President of Human Resources for O'Neal, "[t]he reason for the 30-day delay is cost—most temporaries only stay a few days or weeks." Dyke concedes, however, that if, during the thirty-day period, O'Neal learned, through self-identification or other means, that a temporary employee could not meet the required standards, the worker's assignment was canceled.

After Dyke left Harter's office, she felt the need to check into the matter further for safety reasons. Harter called Christy Nolen in O'Neal's corporate human resources department in Birmingham, Alabama and asked whether

a person with one eye could work or apply for a job with O'Neal. Nolen said she did not think so, but she would have to check. Nolen called Harter back in about a half an hour and told her that they should not have a person with one eye working or applying for a job because that person would not be able to pass O'Neal's vision test. Nolen did not inquire either into Dyke's condition or the type of job for which he was applying. After hanging up the phone, Harter began to wonder whether Dyke should be in the warehouse as a temporary employee, so Harter placed another call to Nolen. She asked whether a one-eyed person should be in the warehouse as a temporary employee and was told "No." Harter then contacted Dyke's supervisor, who was also the Plant Supervisor, and told him that, for safety reasons, human resources said Dyke should not be employed as a temporary worker. The supervisor replied, "That is the end of that, then. We need to contact Blue Jeans." On December 14, 1998, Harter called Blue Jean Jobs and released Dyke from his assignment with O'Neal. The stated basis for Dyke's release was "safety reasons." Blue Jean Jobs assigned Dyke to another employer, Mullinax Packages, on January 11, 1999. Dyke worked at Mullinax on January 11th and 12th and then was a "no show" on January 13, 1999. Following the Mullinax assignment, Dyke had no further contact with Blue Jean Jobs.

On March 3, 2000, Dyke filed suit against O'Neal under the Americans with Disabilities Act ("ADA"), 29 U.S.C. § 12101, *et seq.* Dyke alleged O'Neal violated the ADA both by terminating him from his temporary position and by failing to hire him for a permanent position. With the consent of the parties, the case was assigned to a magistrate judge pursuant to 28 U.S.C. § 636(c). Lacking direct evidence of discrimination, Dyke proceeded under the burden shifting approach set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In order to establish disability discrimination, Dyke must "show that (1) he is

disabled within the meaning of the ADA[,] (2) he is qualified to perform the essential functions of the job either with or without reasonable accommodation and (3) he suffered from an adverse employment action because of his disability." *Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir. 2000). O'Neal filed a motion for summary judgment in March 2001. In June 2001, Magistrate Judge Cosbey granted summary judgment in favor of O'Neal on each of Dyke's claims. In doing so, the judge assumed Dyke had experienced two adverse employment actions. He then determined it could be inferred that O'Neal regarded Dyke as having a substantially limiting impairment such that he would be considered disabled under the ADA. However, the judge held Dyke failed to show he could perform the essential functions of either his temporary position or the permanent job. Dyke filed a timely notice of appeal. On appeal, Dyke challenges only the magistrate judge's ruling on the claim arising from his termination from the temporary position.

## *Analysis*

We review a grant of summary judgment *de novo. Moore*, 221 F.3d at 950. Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As previously noted, Dyke has the burden of showing (1) he is disabled within the meaning of the ADA, (2) he was qualified to perform the essential functions of the temporary job either with or without reasonable accommodation, and (3) he suffered from an adverse employment action because of his disability. *See Moore*, 221 F.3d at 950. As Magistrate Judge Cosbey did, we will assume Dyke's termination from his temporary position after only two weeks and two days constituted an adverse employment action. While O'Neal contends the ending of a temporary assignment is an expected and customary part of temporary employment, on the facts of this record it appears Dyke was arguably entitled to remain at O'Neal for at least thirty days as a temporary employee before he would be required to pass the vision and physical abilities tests and the background check.[1] We focus our attention, therefore, on the first two prongs of the analysis.

An individual is disabled under the ADA if he (1) has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," (2) has "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). On appeal, Dyke does not challenge Judge Cosbey's determination that Dyke did not have a substantially limiting impairment. Nor does Dyke contend that he has a record of an impairment. Therefore, Dyke must point to facts sufficient to support an inference that O'Neal regarded him as having a substantially limiting impairment because of his lack of an eye. The "regarded as" prong is fulfilled if either "(1) a covered entity mistakenly believes that a person has a

---

[1] Dyke does not contend he could have passed the vision test. Additionally, Dyke had a criminal record that included four DUIs, an assault and battery conviction, a burglary conviction, and two convictions resulting from charges of domestic violence.

physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). In *Mack v. Great Dane Trailers*, 308 F.3d 776, 781-82 (7th Cir. 2002), we applied *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), to a "regarded as" claim, holding "if the condition that is the subject of the employer's belief is not substantially limiting, and the employer does not believe that it is, then there is no violation of the ADA under the 'regarded as' prong of the statute."

Clearly, Dyke's monocular vision is not actually substantially limiting. Dyke testified that the condition prevented him only from driving at night, working on roofs, holding his head straight when looking left to right, and participating in various recreational activities. Dyke may nevertheless prevail by showing O'Neal perceived his impairment to be substantially limiting in a major life activity. Dyke contends O'Neal mistakenly believed his lack of an eye substantially limited his ability to see, a major life activity under the ADA. *See* 29 C.F.R. § 1630.2(i). Judge Cosbey, without the benefit of the Supreme Court's decision in *Toyota,* held, "the fact that O'Neal requires all regular employees to have vision in both eyes raises an inference that O'Neal believes that a monocular individual is substantially limited in seeing." After *Toyota*, the Ninth Circuit, in *E.E.O.C. v. United Parcel Service, Inc.*, 306 F.3d 794 (9th Cir. 2002), addressed the issue of monocularity in connection with a "regarded as" discrimination claim. The Ninth Circuit held that a company's institution of vision standards alone was insufficient to show that it regarded those individuals who were unable to meet the standards as substantially limited in their overall ability to see in their everyday lives. *Id.* at 806. We agree with this assessment. While vision standards alone may not be sufficient evidence

to support a finding of "regarded as" discrimination, Dyke was never given a vision test by O'Neal. Therefore, we must determine whether O'Neal perceived Dyke to be substantially limited in his ability to see because of his complete lack of a left eye. O'Neal asserts the only inference that can be drawn from the record is that O'Neal perceived Dyke to be unable to pass its vision test and, therefore, ineligible to work at its warehouse. However, there is evidence in the record which could support a reasonable inference that O'Neal believed Dyke's lack of an eye substantially limited his ability to see. As previously noted, O'Neal did not even administer the vision test to Dyke. O'Neal's human resources office in Birmingham did not inquire at any time as to the specifics of Dyke's condition. Harter's initial reaction upon seeing that Dyke had only one eye was that "it looked odd" and she "wanted to know what was wrong, or was there a problem." However, Harter did not inquire as to the specifics of Dyke's vision. A reasonable jury could infer that O'Neal regarded Dyke's monocular vision as a substantially limiting impairment.

In order to prevail, Dyke must also show that he is qualified to perform the essential functions of the temporary job, either with or without reasonable accommodation. Judge Cosbey held the fact Dyke was receiving disability benefits did not automatically estop him from claiming he was a qualified individual under the ADA. However, Judge Cosbey, relying on *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999), and *Feldman v. American Memorial Life Insurance Co.*, 196 F.3d 783 (7th Cir. 1999), determined that Dyke was estopped from asserting he was qualified because of the statements he made to the Social Security Administration in his October 24, 1998 Report of Continuing Disability.

We agree with Judge Cosbey's conclusion that Dyke cannot show he was a qualified individual under the ADA,

but we base our decision on grounds other than estoppel. In response to questioning at oral argument, counsel for Dyke asserted vision in both eyes was not a requirement for the temporary position. He based this assertion on the fact that Dyke had been performing the temporary job for over two weeks despite his monocular vision. The record evidence, however, is to the contrary. Both Harter and Shawn Smith stated temporary employees who have been working at O'Neal for more than thirty days are required to pass the testing battery established for permanent employees. Dyke concedes that, if O'Neal learned during the thirty-day period before testing was conducted that a temporary employee could not meet O'Neal's standards, the worker's assignment would be canceled. The fact that O'Neal, as a cost-cutting measure, does not test temporary employees until they have been at the plant for thirty days does not mean that the established standards do not apply to temporary positions. Indeed, the evidence supports an inference that the standards do indeed apply to temporary positions, because a temporary employee's assignment is canceled if O'Neal discovers during the initial thirty-day period that the employee is not able to meet the established standards. Furthermore, there is nothing in the record to indicate an employee's status changes from temporary after the tests are administered at thirty days. Nor does Dyke's successful performance of the temporary job for two weeks alter O'Neal's job requirements. There is unchallenged expert testimony that O'Neal's vision requirements were "both reasonable and appropriate for the job classification and work environment." O'Neal's expert stated, "The vision standards are necessary for the job performance and job safety of the workers in the warehouse. . . . Workers who do not meet these vision standards are likely to have difficulty performing their jobs and are at a high risk of injuring themselves and their co-workers." Dyke points to no evidence to contradict this testimony.

Similarly, Dyke has presented no evidence to show he would have been able to pass O'Neal's vision test, and O'Neal's expert reported that an individual needs vision in both eyes to meet O'Neal's vision standards. Because Dyke's monocular vision prevents him from meeting O'Neal's vision standards, we need not address the effects of his NRSD. Dyke cannot show he was able to perform the essential functions of the temporary position, and Judge Cosbey appropriately granted O'Neal's motion for summary judgment on this claim.

The grant of summary judgment in favor of O'Neal is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of Appeals for the Seventh Circuit*