# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1422

_____

Mike Kirkeberg,

        Appellant,

v.

Canadian Pacific Railway,

        Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Minnesota.
\*
\*
\*

_____

Submitted:  December 15, 2009
Filed:  August 27, 2010

_____

Before BYE, BEAM, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Mike Kirkeberg brought claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-.41, alleging that his employer, Canadian Pacific Railway ("Canadian Pacific"), discriminated against him on the basis of his disabilities and retaliated against him for engaging in protected activity.  He also brought claims alleging violations of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, and the Minnesota Whistleblower Act, Minn. Stat. § 181.932.

The district court[1] granted summary judgment in favor of Canadian Pacific. *Kirkeberg v. Canadian Pac. Ry.*, No. 0:07-CV-04621, 2009 WL 169403 (D. Minn. Jan. 26, 2009). Kirkeberg appeals the district court's decision regarding his claims under the ADA and the MHRA. We affirm.

I.

Because we are reviewing a grant of summary judgment, we describe the facts in the light most favorable to Kirkeberg. Kirkeberg worked as the Administrator of Employee Assistance Programs ("EAP") for Canadian Pacific from 2000 until his termination on May 14, 2007. In that role, he assisted the railway's employees with mental health issues, substance abuse problems, workplace conflicts, and traumatic workplace incidents. At one point, Kirkeberg took charge of providing EAP services to the employees of the Delaware and Hudson Railway in the northeastern United States.

In January 2006, Kirkeberg suddenly became legally blind in his left eye after suffering a central retinal vein occlusion ("CRVO"). The vision in his right eye, while naturally poor, is almost normal (20/25 or 20/30) with the help of a corrective lens. Kirkeberg continued working after the incident, but he presented his then-supervisor, Gregory Simmons, with a letter from his physician, dated February 2, 2006, that said Kirkeberg was experiencing significant eye strain as he learned to cope with the loss of vision. The physician stated that Kirkeberg would benefit from a shorter work week during this acclimation period, but Simmons did not act on this recommendation.

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Kirkeberg testified in his deposition that because of his partial blindness, "[e]verything is a little more challenging." He stated that he tires easily and finds it harder to navigate on his left side, especially around objects that are low to the ground. Despite these difficulties, Kirkeberg said that his ability to do his job at Canadian Pacific was not affected by his condition, even in early 2007, when his right eye became infected for several weeks, and he was unable to wear his corrective lens. Kirkeberg could not drive without the lens, but he continued to perform his job. When the infection cleared, Kirkeberg resumed driving without restriction.

After the onset of his vision problems, Kirkeberg asked Canadian Pacific for several accommodations, in addition to the shortened work week suggested by his physician. He requested a larger computer monitor to help him read more easily. He asked that his office be reconfigured to prevent him from tripping. He also discussed with Simmons the possibility of working from home as his right eye acclimated. He believed that he could perform his job functions from home, and he claimed to know of at least three other Canadian Pacific employees who were permitted to work from home. Canadian Pacific provided a bigger computer monitor, but declined to grant the other requests.

In December 2006 or January 2007, Kirkeberg informed Simmons that he had hepatitis C, and that he was considering treatment that might cause him to miss work. He requested that Simmons allow him to work from home on days when his treatment made him ill, but Simmons did not approve the request. Kirkeberg alleges that after he disclosed his hepatitis C to Simmons, Simmons began to treat him like he was "invisible," and stopped responding to his e-mails or requests to meet. Simmons testified that at about this same time, he began to consider outsourcing the EAP to an outside provider.

Kirkeberg received a performance-based bonus and salary increase in February 2007, and he was informed that he would begin reporting to Karen DeTuncq instead

of Simmons. Kirkeberg told DeTuncq about his hepatitis C and the extensive treatment that he was considering. She advised him to take leave pursuant to the Family and Medical Leave Act. Kirkeberg obtained an application for leave but never completed it, because he believed that other employees who missed work for medical treatment were not required to do the same. Kirkeberg ultimately did not pursue treatment for hepatitis C before his termination.

On March 5, 2007, a break-in occurred at Canadian Pacific, and Kirkeberg's computer was stolen from his office. Kirkeberg told Simmons that the computer would not have been stolen if he had been permitted to work from home. Simmons allegedly became upset over this remark and said that nobody was going to work from home unless he (Simmons) worked from home. Later that same day, Simmons sent an e-mail to his supervisor, Glen Wilson, concerning the outsourcing of EAP services. The e-mail, which outlines three EAP price structures, is the first documented evidence regarding Simmons's outsourcing plan.

Four days after the e-mail to Wilson, Simmons sent an email to Wilson's boss, Jim Cunningham, seeking his preliminary approval for an EAP outsourcing plan. Simmons provided Cunningham with a comparison of the then-current cost of providing EAP services internally versus the cost of using an outside provider; he estimated an annual savings of $54,000. He further suggested that outsourcing would enhance and strengthen the company's EAP service offerings. Simmons mentioned that Kathy Frankenberg, Canadian Pacific's Vice President for Labor Relations and Human Resources, already had approved the proposal.

Simmons testified that he began discussing the outsourcing proposal with Frankenberg and Wilson in February 2007, before the March e-mails. He also said that he initiated the plan because he believed the role of the EAP was expanding, especially with the addition of the Delaware and Hudson employees, and he wanted a provider with nationwide presence and around-the-clock availability. Simmons

admitted, however, that he had never told Kirkeberg that he was deficient in his administration of the EAP. Simmons also acknowledged that at the time of his March 9 e-mail, in which he recommended a particular provider, he was unfamiliar with Canadian Pacific's formal process for issuing Requests for Proposal ("RFP").

In May 2007, Cunningham and Frankenberg approved Simmons's Reduction in Force Request, thereby eliminating Kirkeberg's position in order to pursue, as stated in the Request, "[a] business model which can incorporate multi-speciality resources." On May 14, 2007, Simmons informed Kirkeberg that his employment had been terminated, although Canadian Pacific had not yet selected an outside provider for the EAP. Simmons averred in an affidavit that he chose to notify Kirkeberg of the decision at that time because Canadian Pacific was about to solicit bids from providers, including some with whom Kirkeberg had worked, and he wanted to spare Kirkeberg from learning about the outsourcing of his position indirectly through one of them.

In the fall of 2007, Canadian Pacific selected Wellplace, a firm that had provided backup services when Kirkeberg was unavailable, to be the railway's EAP provider. Simmons testified that Wellplace was chosen because of its nationwide reach, twenty-four hour coverage, and comprehensive service offerings. A contract with Wellplace was finalized in early 2008, and, according to Simmons, Canadian Pacific achieved a cost savings of approximately $70,000 during the first year of outsourcing.

Kirkeberg filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") after his termination. The EEOC issued a right to sue letter, and Kirkeberg filed a complaint in the district court. He claimed, as relevant here, that Canadian Pacific discriminated against him because of his vision problems and hepatitis C, and terminated his employment in retaliation for

-5-

his repeated requests for accommodation. On January 26, 2009, the district court granted summary judgment in favor of Canadian Pacific on all claims.

## II.

We review the district court's grant of summary judgment *de novo*, viewing the evidence and drawing all reasonable inferences in the light most favorable to Kirkeberg, the nonmoving party. *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009). Summary judgment is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

We first consider Kirkeberg's disability discrimination claims under the ADA. A person is entitled to protection under the ADA if he is "disabled," and Kirkeberg contends that the district court erred in concluding that he did not meet that criterion. The ADA defines the term "disability" to include, among other things, "a physical or mental impairment that substantially limits one or more major life activities of [an] individual." 42 U.S.C. § 12102(1). Kirkeberg contends that his "seeing, walking, reading, concentrating, thinking, driving, and working" are major life activities that are substantially limited.

Canadian Pacific does not dispute that Kirkeberg's monocular vision and hepatitis C qualify as physical impairments under the ADA. *See* 29 C.F.R. § 1630.2(h)(1). Nor does the employer appear to dispute that "seeing, walking, reading, concentrating, thinking, driving, and working" constitute major life activities under the statute, so we assume for purposes of analysis that these activities qualify.

*See* 42 U.S.C. § 12102(2). The disputed question is whether Kirkeberg's monocular vision and hepatitis C "substantially limit" these major life activities.

To establish that his conditions are substantially limiting, Kirkeberg must demonstrate that he is "[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity," as compared to the average person. 29 C.F.R. § 1630.2(j)(1)(ii). This standard requires Kirkeberg to show more than a "mere difference" between his performance and that of the average individual. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999). The ADA's "substantially" language suggests a difference that is "considerable." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002) (internal quotation omitted). The evidence in support of this contention must be more than generic "evidence of a medical diagnosis of an impairment." *Ristrom v. Asbestos Workers Local 34 Joint Apprentice Comm.*, 370 F.3d 763, 769 (8th Cir. 2004) (internal quotation omitted). Individuals with monocular vision or hepatitis are not *per se* disabled, so a diagnosis, standing alone, does not show how Kirkeberg in particular is affected. *Albertson's, Inc.*, 527 U.S. at 566-67; *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 450 (7th Cir. 2001). Therefore, Kirkeberg must present evidence showing the degree to which *he personally* is limited by his conditions. Under the law in effect at the time when Kirkeberg's claims arose, we must also consider the effects of any mitigating measures, including those undertaken by his body's own systems. *Albertson's, Inc.*, 527 U.S. at 565-66.[2]

---

[2]Amendments to the ADA that took effect on January 1, 2009, supersede the Supreme Court's prior admonitions to consider the ameliorative effects of mitigating measures, *see Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999), and to construe narrowly the ADA's "substantially limits" language, *see Toyota Motor*, 534 U.S. at 196-97. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, § 2(b), 122 Stat. 3553, 3554. Kirkeberg commenced this action before the amendments became effective, and he has not argued that they should apply to this case. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (concluding that if a statute would "increase a party's liability for past conduct, or impose new duties with respect to

With regard to Kirkeberg's monocular vision, an individualized showing of a substantial limitation is essential because of the differences that exist between people with the condition. In particular, individuals "vary by the degree of visual acuity in the weaker eye, the age at which they suffered their vision loss, the extent of their compensating adjustments in visual techniques, and the ultimate scope of the restrictions on their visual abilities." *Albertson's, Inc.*, 527 U.S. at 566. As a result, even though "people with monocular vision ordinarily will meet the Act's definition of disability," the ADA still "requires monocular individuals, like others claiming the Act's protection, to prove a disability by offering evidence that the extent of the limitation in terms of their own experience, as in loss of depth perception and visual field, is substantial." *Id.* at 567 (internal quotation omitted).

Kirkeberg failed to show that any restrictions resulting from his monocular vision substantially limited his major life activities. The medical documents he submitted establish little beyond the fact that he suffered a CRVO in January 2006, and that he experienced eye strain as his body adjusted to his condition. The February 2006 letter from his physician, for example, explained that Kirkeberg had become legally blind in his left eye and was experiencing "significant difficulties at work." Appellant's App. at 111. But the letter also stated: "As [Kirkeberg] acclimates to the loss of vision in his left eye, the strain will become less on his right eye, but *for now* I think it would benefit him significantly to have a shorter work week." *Id.* (emphasis added). This final statement suggests that Kirkeberg's right eye would acclimate to his vision loss, potentially rendering his "significant" discomfort temporary. To be substantially limiting, an impairment "must be of an extended or permanent duration," *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007), but Kirkeberg offered no medical evidence developed after February 2006 to address the degree to which his body acclimated and whether his difficulties were permanent. Nor did he present

transactions already completed," the presumption is that "it does not govern absent clear congressional intent favoring such a result").

specific medical evidence concerning his "loss of depth perception and visual field." *Albertson's, Inc.*, 527 U.S. at 567.

The only evidence that Kirkeberg offered concerning the extent of his body's adjustments is found in his deposition testimony and post-deposition affidavit. Kirkeberg's statements in these materials indicate that he did compensate for his monocularity to a significant degree, and thereby retained much of his depth perception and visual field. Kirkeberg testified that his ability to perform his job at Canadian Pacific was unaffected by his eye problems. He confirmed that he could read "fairly normally" despite his vision loss. He also stated that except for a short period in early 2007 when his right eye became infected, he had no trouble driving and was permitted to do so day and night without restriction.

Any restrictions about which Kirkeberg did testify do not contradict this conclusion. When asked during his deposition what he could no longer do as a result of his vision loss, Kirkeberg responded:

> I can read but it's limited. Reading with one eye is really tiring. Everything I do with one eye is really tiring. . . . I try to concentrate on things. It's really hard to see. And as time [passes] – like for example if I had to read . . . all day, it's going to get blurry. . . . I am less able to navigate, especially like on foot. I bump into people. Trip over things that are low on that side. Especially on that side. . . . Everything is a little more challenging.

Kirkeberg's post-deposition affidavit communicated similar problems, namely that his "eye gets tired, [he] wear[s] out more easily and cannot read for as long as a normal person."

That Kirkeberg tires more easily because of his condition and finds it more difficult to navigate on foot does not rise to the level of a substantial limitation. On

this record, we think the only reasonable conclusion is that while Kirkeberg has not completely compensated for his monocularity, he has adjusted such that he is not substantially limited in any major life activity relative to the average individual. Therefore, Kirkeberg's monocular vision is not a disability under the ADA. *See Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 632 (7th Cir. 2003) (holding that plaintiff's monocular vision, which "prevented him only from driving at night, working on roofs, holding his head straight when looking left to right, and participating in various recreational activities," was not substantially limiting); *EEOC v. UPS, Inc.*, 306 F.3d 794, 803 (9th Cir. 2002) (holding that individuals with no vision in the right eye and problems with near-field vision in the functional eye were not substantially limited under the ADA because both could "drive . . ., read, use tools, and play sports," and their impairments did "not keep either one of them from using his eyesight as most people do for daily life.").[3]

We reach the same conclusion with respect to Kirkeberg's hepatitis C. According to his medical records, Kirkeberg was first told he had the condition "[s]ome time in the early 1990s," but he claimed in his deposition that the diagnosis came in 2007 when he saw a liver specialist after experiencing problems with nosebleeds. Regardless of this discrepancy, Kirkeberg provided no evidence that he was substantially limited by this impairment. The letter from his diagnosing physician reported: "The patient states that he feels well. . . . He also has occasional 'aches and pains' in his joints when he works out but [it] is definitely not disabling in any way. He has a history of mild depression that is well controlled . . . . The remainder of his review of systems is negative." Kirkeberg offered no testimony to supplement or

---

[3]Kirkeberg cites this court's decision in *Doane v. City of Omaha*, 115 F.3d 624, 627-28 (8th Cir. 1997), for the proposition that blindness in one eye is substantially limiting under the ADA, but that decision did not take mitigating measures into account, and was therefore abrogated by *Sutton*. *See Weber v. Strippit, Inc.*, 186 F.3d 907, 913 (8th Cir. 1999).

-10-

contradict this letter. In fact, other than briefly referencing "nosebleeds" in his deposition, he failed to testify about *any* effects from hepatitis.

Only in his post-deposition affidavit did Kirkeberg allege having "numerous side effects from hepatitis C including bloody noses, 'brain fog,' fatigue, sleep disturbances, painful joints, . . . [and] depression . . . , all of which made work more difficult and made reading, thinking, and concentrating harder." These conclusory statements, without more, do not show that he was substantially limited in a major life activity, because they do not illuminate the severity of the alleged conditions or the duration of the restrictions. *See Ristrom*, 370 F.3d at 769-70; *Heisler v. Metro. Council*, 339 F.3d 622, 629-30 (8th Cir. 2003). Accordingly, we agree with the district court that Kirkeberg did not present sufficient evidence to show that he was disabled under the ADA.[4]

B.

Kirkeberg argues alternatively that he was "disabled" within the meaning of the ADA and MHRA because he was "*regarded as* having such an impairment." 42 U.S.C. § 12102(1)(C) (emphasis added). The "regarded as" portion of the ADA, which was "intended to combat the effects of archaic attitudes" about persons "with or regarded as having disabilities," *Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir. 1995) (internal quotation omitted), is satisfied when an "employer mistakenly believes an actual, non-limiting impairment substantially limits one or more of the

_____

[4]Kirkeberg also claims that Canadian Pacific failed to make "reasonable accommodations to [his] known physical . . . limitations." 42 U.S.C. § 12112(b)(5)(A). The ADA, however, requires an employee to show that he is "a qualified individual with a disability" in order to state a valid claim for failure to accommodate, *id.*; *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005), so this claim fails as well.

individual's major life activities." *Pittari v. Am. Eagle Airlines, Inc.*, 468 F.3d 1056, 1061 (8th Cir. 2006).

Kirkeberg contends that Simmons regarded him as having impairments that substantially limited him in the major life activity of working. To support this claim, he points to the fact that Simmons knew his vision was impaired (Kirkeberg wore a patch over his left eye to work beginning in early 2006), and he alleges that Simmons was angered by his treatment-related absences from work and by his requests for accommodation. Kirkeberg also alleges that Simmons began treating him poorly and avoiding him after learning about his hepatitis C, a disease that Kirkeberg says carries "a stigma" because of its association with illegal drug use. He concludes from these facts that Simmons wanted Kirkeberg's employment terminated because he "regarded him as too disabled to work."

Assuming again that "working" is a major life activity, the record does not support Kirkeberg's contention. As Kirkeberg himself acknowledged, the record contains "no criticism of [his] overall job performance." Appellant's Br. 11. Canadian Pacific awarded him both a performance-based bonus and a pay raise in February 2007. Simmons testified without contradiction that he had never told Kirkeberg that his work was deficient, and he could not identify anyone at the company who thought Kirkeberg was not doing what he was supposed to do. DeTuncq, Kirkeberg's immediate supervisor from February 2007 until his termination, indicated that she was not concerned about his ability to perform his job duties, despite his absences. Even assuming that Simmons was angered by Kirkeberg's vision-related absences and avoided him because of his hepatitis C, Kirkeberg failed to show how those feelings and behaviors translated into Simmons regarding him as substantially limited in his ability to work. Accordingly, Kirkeberg has not presented a submissible case that he was "regarded as" disabled.

C.

The analysis of Kirkeberg's MHRA claim is parallel to the ADA claim in all respects but one. The Minnesota statute defines "disability" as an impairment that "materially limits" a major life activity. *See* Minn. Stat. § 363A.03, subd. 12 (2005). The Supreme Court of Minnesota has concluded that "materially limits" is a "less stringent" standard than "substantially limits," *Sigurdson v. Carl Bolander & Sons, Inc.*, 532 N.W.2d 225, 228 (Minn. 1995), although the court's subsequent opinions offer little elaboration on the difference. Decisions of the Minnesota Court of Appeals reflect that the MHRA continues to follow the rule that "temporary and limited impairments" are insufficient, *see Hanson v. Friends of Minn. Sinfonia*, No. A03-1061, 2004 WL 1244229, at *5 (Minn. Ct. App. June 8, 2004), and that "a plaintiff's condition must be considered in its corrected state," after an impairment is mitigated, *see Hoover v. Norwest Private Mortgage Bank*, Nos. A03-1347, A03-1796, 2004 WL 1328057, at *3 (Minn. Ct. App. June 9, 2004); *see also Rohland v. St. Cloud Christian Sch.*, No. A04-821, 2004 WL 2940889, at *8 (Minn. Ct. App. Dec. 21, 2004). Kirkeberg makes no argument as to why he might be "materially" limited, but not "substantially" limited, in major life activities, and he even recites that "[g]enerally claims of disability discrimination under the ADA and the MHRA are analyzed in the same way." Appellant's Br. 29. For the reasons discussed with respect to the ADA, we think Kirkeberg has not presented sufficient evidence that he was materially limited in a major life activity or regarded as such. We therefore affirm the district court's dismissal of the MHRA claims as well.

III.

Kirkeberg separately challenges the district court's grant of summary judgment on his claim of retaliation under the ADA. The statute provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge,

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Kirkeberg claims that Canadian Pacific retaliated against him for requesting what he believed was a reasonable accommodation for his alleged disability.

One might wonder how the theory behind Kirkeberg's retaliation claim can be squared with the text of the statute. An employee who asserts a right under 42 U.S.C. § 12112(b)(5)(A) to obtain reasonable accommodation for an alleged disability has not "opposed any act or practice made unlawful" by the ADA. Nor has he "testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA. On that basis, it might be thought that Kirkeberg's claim never gets out of the starting gate.

In *Heisler v. Metropolitan Council*, however, this court held that "[a]n individual who is adjudged not to be a qualified individual with a disability may still pursue a retaliation claim under the ADA as long as [he] had a good faith belief that [a] requested accommodation was appropriate." 339 F.3d at 632 (internal quotations and citation omitted). *Heisler* relied for this proposition on *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183 (3d Cir. 2003), which reasoned that "[t]he right to request an accommodation in good faith is no less a guarantee under the ADA than the right to file a complaint with the EEOC," and that "'it would seem anomalous . . . to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge.'" *Id.* at 191 (quoting *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997)). Thus, although "[i]t is questionable" whether an employee who merely requests a reasonable accommodation "fits within the literal language of the statute," *Soileau*, 105 F.3d at 16, we are bound by *Heisler* to conclude that making such a request is protected activity for purposes of 42 U.S.C. § 12203(a).

Kirkeberg's retaliation claim is premised on a discussion with Simmons in March 2007. Kirkeberg claims that "after [his] computer was stolen in a break-in, [he] told Simmons that the computer would not have been stolen if [he] had been permitted to work from home." At that point, according to Kirkeberg, Simmons became angry, sent an e-mail to Wilson about outsourcing the EAP, and set in motion the process that led to the elimination of his position. Kirkeberg asserts that his statements to Simmons were a request for reasonable accommodation under § 12112(b)(5)(A), and that Kirkeberg retaliated against him for making this request.

Even accepting the broad view of protected activity adopted in *Heisler*, Kirkeberg has not presented a submissible case of retaliation. No reasonable jury could find that his spat with Simmons in March 2007 amounted to a request for reasonable accommodation. Kirkeberg's statement that the computer would not have been stolen if he had been permitted to work from home did not request a prospective accommodation. Nor did it renew some previous request to work from home at the time of the theft. Kirkeberg's prior request to work from home came in early 2006 when he sought only to work from home on certain days while he was acclimating to monocularity. This request was limited to the acclimation period and did not extend through March 2007. And even if it did, the previous request did not include a proposal to transport his desktop computer between home and office each night such that the computer would have been safe from theft. Kirkeberg merely requested an opportunity to work from home on certain days when he was not feeling well. The only other mention of working from home came when Kirkeberg was contemplating treatment for hepatitis C in early 2007, but he had not started such treatment by the time of the computer theft in March 2007. For these reasons, we conclude that Kirkeberg did not engage in protected activity for purposes of § 12203, and the district court properly dismissed his retaliation claim.

\* \* \*

The judgment of the district court is affirmed.
_____

-15-